## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| UNITED STATES OF AMERICA | : |
|  | : Hon. Claire C. Cecchi |
| v. | : *Referred to* |
| MATTHEW BRENT GOETTSCHE | : Hon. Michael A. Hammer |
| [DEFENDANT TWO REDACTED] | |
| JOBADIAH SINCLAIR WEEKS | : Crim. No. 19-877 |
| JOSEPH FRANK ABEL | |
| SILVIU CATALIN BALACI | : |

## GOVERNMENT'S OPPOSITION TO
## DEFENDANT GOETTSCHE'S MOTION TO REVOKE PRETRIAL DETENTION

CRAIG CARPENITO
United States Attorney

On the Brief:

Jamie L. Hoxie
David W. Feder
Anthony P. Torntore
Assistant United States Attorneys

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................... 1

TABLE OF AUTHORITIES.............................................................. 3

PRELIMINARY STATEMENT ........................................................ 5

I.    Governing Legal Standard....................................................... 8

II.   Pretrial Detention Is Warranted Based on Consideration of the § 3142(g) Factors. ..................................................................... 10

      A.    The Nature and Circumstances of the Offenses Support Detention. ................................................................... 10

      B.    The Weight of the Evidence Against Goettsche Strongly Supports Pretrial Detention. ......................................... 18

      C.    Goettsche's History and Characteristics Weigh in Favor of Pretrial Detention. ................................................... 22

            1.    Goettsche's Upbringing in Colorado Does Not Support Pretrial Release. .............................................. 24

                  a.    Goettsche Involved His Brother in the Fraud Scheme. ............................................................. 26

                  b.    Goettsche Directed His Wife To Call Someone With Whom Goettsche Has Engaged in Suspect Behavior and Apparently Instructed Her to Tell Him to Contact a Lawyer. .................................................. 27

                  c.    Goettsche's Mother Was Hesitant to Disclose to Law Enforcement That Goettsche's Brother Was in Her Home. .................................................. 29

            2.    Goettsche's Tremendous Access to Wealth—Much of Which Law Enforcement Has Not Been Able to Locate or Seize— Necessitates Pretrial Detention.......................... 30

                  a.    Cryptocurrency Cold Storage Devices Recovered from Goettsche's Home Reflect That Goettsche has had Access to Significant Funds. ................................... 30

                  b.    Goettsche Has Several Cryptocurrency Exchange Accounts. ............................................................. 32

c.   Goettsche Engaged In Several Money Transfers Through Several Different Bank Accounts, AU Card, Entities, and Law Firms............................................. 34

d.   The Cases Goettsche Cites Are Distinguishable Because Those Defendants Did Not Move Their Money Around Several Different Entities and Accounts Around the World Making it Difficult to Trace. ......... 37

3.   Goettsche's Substantial International Ties—Including His Longstanding Business Partner Who Remains At-Large in a Non-Extraditable Country—Cuts in Favor of Detention. .... 41

D.   Goettsche Will Present a Danger of Safety to the Community...... 48

CONCLUSION ............................................................................................. 50

# TABLE OF AUTHORITIES

Cases

*United States v. Abdullahu,*
  488 F. Supp. 2d 433 (D.N.J. 2007) ........................................................... 24

*United States v. Bodmer,*
  Crim. No. 03-947, 2004 WL 169790 (S.D.N.Y. 2004) ................................... 40

*United States v. Boustani,*
  356 F. Supp. 3d 246 (E.D.N.Y. 2019) ................................................... 16, 17

*United States v. Cirillo,*
  No. 99-1514, 1999 WL 1456536 (3d Cir. July 13, 1999) ............................ 25

*United States v. Delker,*
  757 F.2d 1390 (3d Cir. 1985) ..................................................................... 8

*United States v. Dreier,*
  596 F. Supp. 2d 831 (S.D.N.Y. 2009) ................................................... 37, 38

*United States v. Hansen,*
  108 F. App'x 331 (6th Cir. 2004) .............................................................. 40

*United States v. Khusanov,*
  731 F. App'x 19 (2d Cir. 2018) ................................................................. 17

*United States v. Livingston,*
  Crim. No. 15-627, 2016 WL 1261464 (D.N.J. Mar. 31, 2016) ....................... 8

*United States v. Lopez,*
  827 F. Supp. 1107 (D.N.J. 1993) .............................................................. 26

*United States v. McIntyre,*
  Crim. No. 16-13 (KM), 2018 WL 385034 (D.N.J. Jan. 10, 2018) ................. 48

*United States v. Provenzano,*
  605 F.2d 85 (3d Cir. 1979) ....................................................................... 48

*United States v. Reuben,*
  974 F.2d 580 (5th Cir. 1992) .................................................................... 25

*United States v. Schenberger,*
  498 F. Supp. 2d 738 (D.N.J. 2007) ........................................................... 48

Statutes

15 U.S.C. §§ 77e ................................................................................................ 4

18 U.S.C. § 371 .................................................................................................. 4

18 U.S.C. § 1349 ................................................................................................ 4

18 U.S.C. § 3142(a) ........................................................................................... 6

18 U.S.C. § 3142(f) ............................................................................................ 7

18 U.S.C. § 3142(g) ........................................................................................... 7

## PRELIMINARY STATEMENT

The Government respectfully submits this brief in opposition to the motion of defendant Matthew Brent Goettsche ("Goettsche") to revoke the pretrial detention order issued in the U.S. District Court for the District of Colorado on December 13, 2019. *See* ECF No. 36 ("Goettsche Br." or "GB_"); Order of Detention, ECF No. 9, Mag. No. 19-277 (NYW) (D. Col. Dec. 13, 2019) (the "Colorado Order") ("USA Ex. A"). For the reasons stated herein, the Court in Colorado correctly determined that Goettsche is both a flight risk and presents a danger of safety to the community; accordingly, his request should be denied.

In his brief, Goettsche fails to meaningfully controvert that: (1) he has transacted in hundreds of millions of dollars' worth of virtual and fiat currency derived from defrauded BitClub Network ("BCN") investors; (2) substantial portions of Goettsche's BCN fortune remain unseized, owing to BCN's dependence on anonymized transactions in virtual currency, with tracing complicated by Goettsche's use of overseas exchanges; (3) Goettsche's fraud was truly worldwide and involved at least one business partner who remains at-large overseas; and (4) Goettsche succeeded in defrauding victims for years, in part, through his reliance on anonymous, online monetary transactions and encrypted communications—modern, mobile conveniences that Goettsche could exploit to escape prosecution and launch new frauds. Given these realities, no combination of pretrial release conditions can ensure that Goettsche will appear

to answer for the significant criminal liability that he faces or address the risk of further financial detriment to the community.

## PROCEDURAL BACKGROUND

On December 5, 2019, a federal grand jury returned a two-count Indictment charging Goettsche and four other defendants with crimes related to BCN—a virtual currency-based fraud scheme that Goettsche developed and operated from 2014 through the date of his arrest. Count One charged Goettsche and others with wire fraud conspiracy that took at least approximately $722 million of investor money in bitcoin, in violation of 18 U.S.C. § 1349. Count Two charged Goettsche with conspiring with others to offer or sell unregistered securities in BCN, contrary to 15 U.S.C. §§ 77e and 77x, in violation of 18 U.S.C. § 371.

On December 10, 2019, Goettsche was arrested in Colorado as part of an organized, worldwide takedown. Codefendants Jobadiah Sinclair Weeks and Joseph Frank Abel were arrested on the same day in Florida and California, respectively. Codefendant Silviu Catalin Balaci was arrested and detained in the Frankfurt, Germany area. The second captioned defendant—Goettsche's business partner, whose identity remains under seal—remains at large and is believed to be beyond the reach of extradition. The domestic defendants— Weeks and Abel—were ordered detained in their respective districts of arrest.

On December 13, 2019, Goettsche appeared for and was ordered detained at a bail hearing before the Honorable Kristen L. Mix, U.S. Magistrate

Judge for the District of Colorado. Goettsche mischaracterizes that hearing in two key respects. *First*, on the morning of the hearing, the Government filed a brief in support of its argument that Goettsche presented (1) an unreasonable risk of flight, and (2) a danger of safety to the community. Goettsche now contends that he "did not have an opportunity to file a written response" to the Government's submission. GB3. Not so. At the start of the hearing, Judge Mix asked whether Goettsche "wish[ed] to have some time to respond to the motion in writing or does the defendant intend to proceed with the hearing today?" Bail Hearing Tr. at 3, ECF No. 13, Mag. No. 19-277 (NYW) (D. Col. Dec. 13, 2019). Goettsche's counsel responded, "Your Honor, we're prepared to proceed today." *Id.*

*Second*, Goettsche claims that the Government abandoned its argument that he posed a danger of safety to the community. GB1, n.1. But the Government advanced both risk of flight and danger to the community arguments at the hearing, as reflected in the Judge Mix's finding that "no condition or combination of conditions of release will reasonably assure the appearance of [Goettsche] and the safety of the community." Colorado Order at 3.

On January 15, 2020, Goettsche appeared before the Honorable Claire C. Cecchi and pleaded not guilty to both counts. On January 31, 2020, Goettsche filed the pending motion. Judge Cecchi referred Goettsche's motion to Your

Honor. Goettsche's motion has been set for hearing on February 13, 2020 at 2:30 p.m.

**ARGUMENT AND AUTHORITIES**

## I.   Governing Legal Standard

The Bail Reform Act governs this Court's power to detain defendants pending trial. 18 U.S.C. § 3142(a), (e). Title 18, United States Code, Section 3145(b) provides that "[i]f a person is ordered detained by a magistrate judge . . . the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order." *Id.* § 3145(b). The review of the Colorado Order is *de novo. See United States v. Livingston*, Crim. No. 15-627, 2016 WL 1261464, at *1 (D.N.J. Mar. 31, 2016) (Cecchi, J.) (*citing United States v. Delker*, 757 F.2d 1390, 1394-95 (3d Cir. 1985)).

The court "shall order the pretrial release" of the defendant "unless the judicial officer determines that such release will not reasonably assure the appearance" of the defendant "or will endanger the safety of any other person or the community." *Id.* § 3142(b). The court should hold a hearing "to determine whether any condition or combination of conditions will reasonably assure the appearance of such person as required and the safety of any other person and the community[.]" *Id.* § 3142(f).

At the hearing, the Court must take certain factors into account when determining whether "there are conditions of release that will reasonably assure

8

the appearance of the person" at trial "and the safety of any other person and the community" such as:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591 [sex trafficking of children or by force, fraud, or coercion], a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including—
>
>> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>
> . . . .
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

"The rules concerning admissibility of evidence in criminal trials do not apply" to detention hearings. 18 U.S.C. § 3142(f). If the court finds that the defendant is a flight risk and that no condition or combination of conditions of release will reasonably assure the defendant's presence at trial or the safety of any other person or the community, the court must order that the defendant be detained pending trial. *Id.* § 3142(e)(1).

## II.     Pretrial Detention Is Warranted Based on Consideration of the § 3142(g) Factors.

As the Government will show at the upcoming hearing, Goettsche's detention pretrial is appropriate because no combination of conditions will reasonably assure his appearance or the safety of the community.

### A.     The Nature and Circumstances of the Offenses Support Detention.

The nature and circumstances of the offenses in the Indictment support Goettsche's pretrial detention. Goettsche is accused of defrauding investors through his participation in BCN, "a worldwide fraudulent scheme that solicited money from investors in exchange for shares of pooled investments in cryptocurrency mining and that rewarded existing investors for recruiting new investors." Ind. ¶ 1.a. Goettsche created and operated BCN throughout the charged conspiracy—from at least April 2014 until his arrest in December 2019. *See* Ind. ¶¶ 1.b, 2.

In June 2014, Goettsche pitched codefendant Balaci—a computer programmer arrested in and pending extradition from Germany—on forming a multi-level marking ("MLM") company predicated on virtual currency mining— the entity that would become BCN. Balaci told Goettsche that the margins from the MLM portion of the business would be "insane," because Balaci "ha[d] seen [Goettsche's] skill at constructing attractive matrixes that have almost 0 chance of paying more than 50% of max for 99% of the people."

10

Goettsche worked with Balaci to create a bitcoin mining pool and to make it appear that BCN had a high volume of hash power, which would make investors and potential investors believe that, if they gave their money to BCN, they would have a good chance at "mining" bitcoin more profitably through the pool than if they attempted to "mine" it themselves. At the outset, Goettsche discussed with Balaci that, in fact, there was no mining power, and Balaci warned that, even if there was, the mining would almost certainly not be profitable. But generating actual mining "profit" was not what Goettsche envisioned for the bitcoin mining pool—he merely wanted "proof" that BCN was mining in some capacity so that investors would be less worried that they were giving their money to a pyramid scheme and would more easily invest in BCN shares.

For example, in January 2015, Goettsche told Balaci, "we are building this whole model on the backs of idiots," and "to prove the mining . . . just means convincing the morons." Goettsche likely sought out "idiots" and "morons" because it appears BCN was structured as a pyramid scheme, with only a portion of investor funds used for virtual currency mining and the remainder re-allocated to existing investors. As Balaci observed in October 2014, "I guess most people do not know only 40% is used for mining and the rest for commissions [for signing new investors up into BitClub]," to which Goettsche remarked, "the leaders know . . . its the sheep that dont." In other words, Goettsche found a way

11

to dupe thousands of investors of hundreds of millions of dollars for his own benefit and for the benefit of his co-conspirators.

Goettsche and his coconspirators showed BCN investors what they purported were "mining figures" but were in fact made up or altered. For example, in January 2015, Goettsche challenged Balaci "to get us 'proof' of our own pool." Balaci responded, "'proof' ? as in without you having mining power?," to which Goettsche replied, "yep" because "that will instantly net us 10x that" and "most of these idiots . . . have no idea . . they just want to make sure we can verify SOMETHING." Once the pool was created, Goettsche and Balaci altered the figures that were paid out to investors to make it appear that BCN was either more or less profitable, depending on the result Goettsche wanted to achieve. When, for example, Goettsche wanted to attract new investors to BCN, he would instruct Balaci to "bump up" the payout to members. In 2017, Goettsche discussed possible exit strategies from BCN with his coconspirators. As part of that plan, Goettsche proposed that they should "[d]rop mining earnings significantly[.]" Through the course of its existence, BCN took in at least approximately $722 million in bitcoin from investors.

In addition, Goettsche worked with others to help promote the sale of BCN shares while the shares were not registered with the U.S. Securities and Exchange Commission ("SEC"). Goettsche helped to promote the sale of shares by conspiring to alter the mining figures displayed to investors. Goettsche also

worked to create investor updates that would help promote further sales in BCN. Goettsche traveled the world to build contacts and further spread BCN.

As a part of this offense, Goettsche and his coconspirators attempted to set up BCN so as to avoid detection by U.S. law enforcement, as exemplified by the below 2015 conversation:

| BALACI | all invoices from now on I am filing on the Hong Kong company you sent me |
| BALACI | just so you know |
| GOETTSCHE | yep, good! |
| GOETTSCHE | that entity should be well protected |
| GOETTSCHE | but you never know unless it's challenged |
| BALACI | ☺ |
| BALACI | I know soooooooo little about that world :D |
| BALACI | leagl stuff is beyond me |
| GOETTSCHE | please make sure you take steps to keep this under the radar |
| BALACI | *legal |
| GOETTSCHE | Yea |
| GOETTSCHE | fucking lawyers |
| BALACI | well, I am not broadcasting anything to anyone |
| BALACI | all contractors talk to me only |
| BALACI | and have NDAs signed |
| GOETTSCHE | Good |
| BALACI | and the invoices only get filed to the Ro guv so not public in any way |
| BALACI | nothing is public |
| GOETTSCHE | yep, I mean more on the public info that is out there . . . servers, IP, just make them work to find this entity. If they find it then the fun begins and I will know they have gone past the moat |
| GOETTSCHE | in other words, dont leave the drawbridge down . . . lol |
| BALACI | well, IPs are public, no way around it |
| BALACI | we can hide them under cloudflare |
| BALACI | might be a good idea |
| GOETTSCHE | yes! |
| GOETTSCHE | lets start |
| BALACI | but the IPs are in the DC name and without a Court Order they will not release info |
| GOETTSCHE | take extra steps |

| GOETTSCHE | I will pay for it |

Further, in April 2016, BCN announced that it was going to "exit" the U.S. market. This did not actually happen—BCN continued to accept U.S. investment—but was merely stated publicly in an effort to avoid liability. As one BCN promoter stated bluntly in a promotional video:

> [A]fter dealing with all the attorneys and all the smart-mind crypto guys, they said the best thing you could do was put the [no U.S. investors] policy up on your site, to have plausible deniability . . . . it's there to make sure that uh . . . a hater, who's related to some district attorney, doesn't send a dog after us to see if there is anything they can smell[.]

This offense conduct suggests that Goettsche and his coconspirators understood the illegal implications of BCN and took deliberate deceptive steps to avoid detection by law enforcement and regulators. This militates strongly against pretrial release.

During the course of the scheme, Goettsche and his coconspirators utilized multiple means of communication that are not readily accessible to law enforcement (highlighting further that the BitClub Network was not a legitimate business). Goettsche used several encrypted "apps" that are very difficult, if not impossible, for law enforcement to intercept and email providers that operate in foreign countries beyond the reach of traditional U.S. law enforcement process. Far from acting like the everyday Colorado businessman he professes to be, Goettsche utilized multiple methods of communication that are hallmarks of cybercriminals. If released, Goettsche has the know-how and experience to resume confidential communications to coordinate flight or spin up a new fraud.

14

In addition, the second named codefendant in this case—Goettsche's long-term business partner ("Defendant Two")—remains on the run and is believed to be hiding in either a non-extradition country or a country unwilling to assist with his capture. Goettsche has business dealings with Defendant Two that predate BCN, and Defendant Two has access to at least two private planes. *See, e.g.,* USA Ex. B (email from Goettsche referencing that he had "pretty much been paying [Defendant Two] under the table as expenses"); USA Ex. C (Defendant Two introducing Goettsche as his business partner in email communications involving the purchase of a plane from a Singapore-based company). Both Goettsche and Defendant Two—whose alleged illegal activities Goettsche is well aware of—have strong incentives for Goettsche to flee.

Goettsche's foreign contacts through the course of this scheme do not stop with his codefendants. Goettsche and his coconspirators traveled around the world soliciting investments in BCN. On August 7, 2015, BitClub Network issued an investor update in which they claimed that they had members in over 80 countries and "continue to grow very fast . . . all over the world." In 2016, BitClub Network sent out another investor update in which they claimed that 94% of BitClub Network members were located outside of the United States. Goettsche and his codefendants had promotional and recruitment help from many individuals worldwide; those individuals also have powerful incentives to hide Goettsche from prosecution and minimize any revelation of their own culpability.

As one court has observed in a case involving a similarly large-scale international fraud, "a defendant's alleged ties to a large [ ] syndicate indicate that he has strong connections to people who have the resources to, ability to, and interest in helping him flee the jurisdiction, favors denying bail." *United States v. Boustani*, 356 F. Supp. 3d 246, 252 (E.D.N.Y. 2019) (denying bail for defendant charged with fraud and money laundering offenses) (internal quotations omitted and omission in original).

Goettsche argues that the nature of his crimes does not warrant pretrial detention. *See* GB18-20. Goettsche does not address the messages he exchanged with codefendant Balaci and others about displaying false figures to the "sheep" as mining earnings, the inherent nature of his crimes as necessarily involving duping largely unsophisticated investors—some of whom were in developing countries and had very little to "invest"—by essentially lying to them for several years, or that he and his codefendants intentionally disregarded BCN's obligation to register with the SEC and told investors to obscure their whereabouts from U.S. authorities. Instead, he seems to suggest that this scheme is not "that big of a deal" because BCN purchased some equipment and mined some virtual currencies. If anything, Goettsche's minimization of his own conduct (which wholly ignores his obligation to have registered BCN with the SEC) suggests that he *both* is a risk of flight and remains a danger of safety to the community.

Goettsche also argues that the fact that a Grand Jury determined that Goettsche convinced investors to part with at least $722 million worth of bitcoin

as a part of this illegal conduct is "in a vacuum . . . not relevant for purposes of assessing whether defendant is a risk of flight." GB20. The Government respectfully disagrees. At the very least, it shows (1) the size of the scheme was incredibly large-scale, which will affect his Guidelines exposure; and (2) Goettsche and his coconspirators have had substantial access to a tremendous amount of wealth.

As for the Guidelines, the astronomical loss amount makes Goettsche's sentencing exposure significantly higher than that of the run-of-the-mill white-collar defendant. His advisory guideline range is currently estimated to be somewhere between 235-293 months' imprisonment. As other courts have observed, "[w]hen faced with the possibility of a significant prison term, defendants have a strong incentive to flee." *Boustani*, 356 F. Supp. 3d at 252; *see United States v. Khusanov*, 731 F. App'x 19, 21 (2d Cir. 2018) (summary order) ("a district court does not clearly err in concluding that a defendant facing a potentially lengthy prison sentence possesses a strong motive to flee").

Goettsche also has access to significant wealth that the Government has not yet been able to seize. Goettsche could lead a very comfortable life outside of the United States if released prior to his trial. Goettsche's contention that his illegal pyramid scheme also generated over 88,904 in bitcoin and 508,695 in ethereum (another cryptocurrency), GB15-16, makes pretrial detention more appropriate, not less. As Goettsche concedes elsewhere in his brief, investors received only a "portion of the mining rewards mined by BitClub Network." GB19.

17

Finally, Goettsche argues that he should be permitted to be released pretrial to "allow him to meaningfully participate in his defense," which is purportedly "even more necessary here" than in nearly all other types of white-collar cases because "there are fewer experts in digital currency than in other, longer-established industries." GB2. Goettsche's argument—that criminals who perpetrate particularly complex fraud schemes should be released pretrial because they managed to create more chaos with their illegal scheme than others—cannot be credited. While the methods by which Goettsche accomplished his criminal endeavors were sophisticated and intentionally complicated, at bottom, Goettsche faces criminal liability because he and others discussed lying to investors and promoted the scheme without registering it with the SEC. These concepts are not complicated. Goettsche is capably represented by four partners at major law firms—three of whom are former federal prosecutors—who will undoubtedly be able to understand the pyramid scheme that Goettsche and his coconspirators created and failed to register with the SEC.

### B.    The Weight of the Evidence Against Goettsche Strongly Supports Pretrial Detention.

Goettsche does not address the weight of the evidence against him, which is substantial. The Government has messages and emails between Goettsche and his coconspirators that outline portions of Goettsche's fraudulent scheme. For example, in October 2014, Goettsche and Balaci exchanged the following, with Goettsche explicitly telling Balaci they would need to "fake it" for a while:

18

| GOETTSCHE | but we may need to fake it for the first 30 days while we get going |
| BALACI | sure |
| BALACI | we can do that |
| GOETTSCHE | it needs to look real though ☺ |
| GOETTSCHE | so need a bit of your magic touch on it |
| BALACI | look real how? We fake real revenue numbers and show them in account daily |
| GOETTSCHE | and we dont want to fake it too good so that when we need to back it down it drops off |
| GOETTSCHE | terminolgy |
| GOETTSCHE | explanation of what is happening |
| GOETTSCHE | inconsistent numbers daily so its not perfect |
| GOETTSCHE | all kinds of stuff |
| BALACI | inconsistent numbers IS real |
| GOETTSCHE | people think we are not legit or are weary so we need to be careful rolling this out |
| BALACI | if we pay consistent numbers it will be fake |
| GOETTSCHE | i know... thats what I am saying, make the numbers inconsistent |
| BALACI | yeah |
| BALACI | will make it real |

Goettsche then instructed Balaci to manipulate the figures that BCN was displaying to investors as their pro rata share of bitcoin mining earnings:

| GOETTSCHE | bump up the daily mining earnings starting today by 60% |

. . . .

| BALACI | 60%? |
| BALACI | wow |
| BALACI | that is not sustainable, that is ponzi teritori and fast cash-out ponzi |
| BALACI | but sure |
| GOETTSCHE | yea they have not been bumped in a long time |
| BALACI | ok |
| GOETTSCHE | we can push them back down, but we need a boost |
| BALACI | you do realize you need to pay for like 1000 days technically? |
| BALACI | kk |
| GOETTSCHE | we will dilute over time |
| GOETTSCHE | members will think its due to strong growth |

| GOETTSCHE | but right now the payout does not even break people even after 1,000 days |
| GOETTSCHE | we need to look like we will break them even in 9-12 months |
| GOETTSCHE | and then start to curtail it from there |
| GOETTSCHE | just bump it by 60%, im putting together an update about newly installed equip and that we will be showing mining proof in the next week |

In a January 2015 email exchange, Balaci complained that Goettsche had been paying out mining earnings to a degree that was unsustainably high, to which Goettsche responded that they needed the higher figures to drive investment and would just "continue to back it down gradually." *See* USA Ex. D. On February 10, 2015, Goettsche instructed Balaci, "lets get these two things going…Paying commissions daily and consistent with solid stats and showing mining stats (even if fudged) then we will be good for awhile and can focus on behind the scenes."

Later, in September 2017, Goettsche sent Defendant Two an email, in which he outlined a proposed exit strategy for BCN's bitcoin mining pools. *See* USA Ex. E (Sept. 10, 2017 email from Goettsche to Defendant Two). As a part of that plan, Goettsche proposed that BCN further manipulate the "mining earnings" figures so they can get "RAF!!!! (rich as fuck)."

There is also strong evidence that BCN was set up to be a pyramid scheme. A review of BCN's website on May 14, 2018 reflects literal human pyramids in explaining the "compensation structure" (i.e., the pyramid scheme portion of BCN investor compensation).



Finally, while outlining all of the Government's evidence against Goettsche is beyond the scope of this brief, it is worth noting that, in 2019, codefendant Abel posted a video online about BCN, in which he said:

> Let me give you guys some facts and then you guys can do your own due diligence as to why **I think if you are promoting Bitclub network today, you are promoting a ponzi.** If Bitclub receives no more money, they should be able to pay the 650,000 people who have given them billions of dollars in equipment and sales and they should have hundreds and hundreds of millions of dollars of equipment (which they don't). So, all I can tell you right now is get your facts straight. The math is easy. Find out how many machines are being ran, how much the electricity cost is. And find out all of those GPUs that the company purchased for you and I. Find out where . .. otherwise we could have put the mining equipment there.

Given the overwhelming evidence of fraud against Goettsche, there is a significant risk that he will not appear at trial to answer these charges.

### C.   Goettsche's History and Characteristics Weigh in Favor of Pretrial Detention.

Goettsche dedicates the majority of his brief to arguments that his history and characteristics weigh "heavily" in favor of pretrial release, *see* GB5, but fail to meaningfully address many of the significant points raised by the Court during Goettsche's first detention hearing.

For one, Goettsche's behavior upon arrest warrants scrutiny because officers had to breach the door of Goettsche's home because he did not open the door for them. Law enforcement approached Goettsche's house on the morning of December 10, knocked on the door multiple times, and loudly announced that police were there with a warrant. This continued for approximately 15-20 seconds, at which point law enforcement saw someone inside the home pass by the front door from the right to the left. After the person walked past the front door and failed to open it, law enforcement kept knocking on the door loudly and continued to announce that police were there. After approximately 10 more seconds went on without any response, law enforcement decided to breach the door. Upon entry, law enforcement observed Goettsche standing to the left of the main entrance in the doorway of his office.

In the office, law enforcement observed three desktop computers located behind an office desk. One of the desktop computers was not connected to any other device. The other two desktop computers appeared to be the only computers plugged into the monitors and keyboards on the desk. The monitors and keyboards were arranged on the desk in a manner that would suggest that

someone was using them to perform work at a home office. The power supply cords for the two desktop computers were connected to the power outlets in the wall, however, these cords were disconnected from the desktop computers.

It appears from these facts that Goettsche chose to go to his office for some purpose on the morning of his arrest, rather than open the door for police, and, curiously, the power supplies to both of his computers that appeared to be set up for work had been disconnected by the time law enforcement breached the door.

The proofs demonstrate Goettsche's lack of candor, not only to BCN investors, but to others. For example, in late September 2017, in talking about his exit strategy from the company, Goettsche and Balaci had the following exchange:

| GOETTSCHE | if we do this exit right, its really game over man! talking Billion dollar play here |
| BALACI | *broken down into days |
| GOETTSCHE | great |
| GOETTSCHE | are we ready to move to new platform? |
| BALACI | going public exit? or? |
| GOETTSCHE | or still working on it |
| GOETTSCHE | yea public |
| GOETTSCHE | full audit |
| GOETTSCHE | ***and we can make up the numbers anyway we want to appease auditors*** |
| BALACI | geez |
| GOETTSCHE | as long as we have good stats ☺ |

Goettsche also exploited even critical co-conspirators like Balaci when it suited his needs:

23

| BALACI | in Feb he told me to buy and rent extra space and deal with the power for at least an extra 25MW. So i did, did rental agreements, bought land and a high voltage transformation station, prepped everything ans pent a lot |
| BALACI | this month (when I flew to Canada) he told me that the only way he will buy from me is if I give him 50% of my company |
| INDIVIDUAL | [omitted] |
| BALACI | so he put me with my back at the wall because I trusted him (spent a ton of money, + 5 year rent of 50k a month) and now takes advantage of it |
| INDIVIDUAL | [omitted] |
| INDIVIDUAL | [omitted] |
| BALACI | this, after i literally made him hundreds of mil in the past 2 years with his stupid projects |
| INDIVIDUAL | [omitted] |
| BALACI | he literally has an island in Belize and a private plane |
| BALACI | yeah... I do not get it honestly |
| BALACI | because with this dick move he lost me |
| BALACI | for the past 11 years I was hi loyal dog, did not work for anybody else |
| BALACI | and now he screws me like this... |

In other words, Goettsche has a demonstrated history of willingness to lie and manipulate others when it serves his best interest. This behavior suggests that the Court should be skeptical about any promises Goettsche makes that he will abide by conditions of release.

### 1. Goettsche's Upbringing in Colorado Does Not Support Pretrial Release.

Goettsche argues essentially that because his parents, his wife, and he grew up and have lived in Colorado, he should be granted pretrial release. *See* GB5-6. But several courts have recognized that "the mere presence of defendant's immediate family" is insufficient "to assure his presence at trial." *United States v. Abdullahu*, 488 F. Supp. 2d 433, 442 (D.N.J. 2007); *see also*

24

*United States v. Reuben*, 974 F.2d 580, 586 (5th Cir. 1992) ("The family ties must be the type of relationship that exert a level of control that would prevent the defendant from fleeing."). Here, Goettsche's family ties are not the type of ties that would prevent him from fleeing. In addition to the tremendous wealth that Goettsche has used to assist his family, as discussed further below: Goettsche involved his adult brother ("Brother") in BCN from its inception; Goettsche, on the morning of the takedown, told his wife to contact his CPA ("Subject 1") and tell him to contact a lawyer; and Goettsche's mother was hesitant to tell law enforcement that Brother was in her home on December 10. Goettsche attributes these items to a family's reaction to an unexpected encounter with law enforcement; but the family's entanglement in the underlying charges makes it fair to consider whether the family was also reacting to the other shoe dropping.

The cases Goettsche relies on are distinguishable. First, Goettsche cites to *United States v. Cirillo*, No. 99-1514, 1999 WL 1456536 (3d Cir. July 13, 1999), a case in which the defendant was charged with conspiring to distribute a minimal amount of drugs. *Id.* at *2 n.1. In *Cirillo*, the weight of the Government's evidence was the *only* factor that supported pretrial detention. *Id.* at *1. Unlike here, there was no suggestion that the defendant maintained an international criminal fraud scheme, that he had access to extraordinary wealth, that he used and moved his money around through several different entities, bank accounts, and cryptocurrency exchanges, or that he owned a private island. Instead, the defendant in *Cirillo* worked for a "well-established family business."

25

Goettsche also cites to *United States v. Lopez*, 827 F. Supp. 1107 (D.N.J. 1993), another drug case in which the Court found that the defendant played a "comparatively limited role in the alleged conspiracy." *Id.* at 1110. Again, *Lopez* did not involve an international complex fraud, and there was no mention of the defendant's ability to finance his flight, much less his access to potentially hundreds of millions of dollars.

> **a.    Goettsche Involved His Brother in the Fraud Scheme.**

Although the investigation is ongoing, it appears that Brother was an integral part of the BCN scheme and worked alongside Goettsche. At the beginning of the scheme in 2014, Goettsche asked Balaci to set up three administrative accounts which appear to be for the BCN site: one for him; one for Defendant Two; and one for Brother. The evidence then shows that Brother remained involved in BCN, with high-level administrative access to the BCN website. In a 2018 email from an account law enforcement believes was utilized by Brother, he appears to provide a "to do" list for BCN, referencing that he needed to check with "Matt" (Goettsche) and "Cata" (Balaci). The list contained the following:

> Members ask about the specs of their mining and complain on the amounts they receive.
>
> • I hit them with a BS response that says all shares are earning and getting the convenience of not having to pay a power bill, or maintaining their machine, and if the machine breaks it's replaced here at BCN and not at home if they were to have purchased it.  Is this good?  Help is needed for this AMMO.

On the day of the takedown, law enforcement executed a search warrant at Brother's house in Utah. Law enforcement found, among other things, notes related to BCN and a white board displaying the words: "Its okay to take advantage." Goettsche dismisses "[w]hatever those words might mean" as "not reflect[ing] in any way whatsoever on whether [Brother] . . . would be a flight risk if he were charged, let alone whether [Goettsche] is a risk of flight." GB8. But Brother's white board makes clear that he worked alongside Goettsche in BCN. *See* USA Ex. F (photo of whiteboard in Brother's house). It contains a heading "To Do 4 Work (BCN)," under which there are several tasks, including "Send Emails to Cata, Russ, Matt," "Talk to Matt about auto-support for Jan. 1st 2020," and "BC Premier Refunds." Goettsche downplays Brother's role, but Brother was an integral part of BCN and, though uncharged, his exposure is real. Brother's involvement cuts against Goettsche's release, because Brother may have a strong incentive to assist with flight, and his unmonitored access to a family member with access to evidence of the scheme from inception may lead to witness tampering or obstruction.

  **b.** **Goettsche Directed His Wife To Call Someone With Whom Goettsche Has Engaged in Suspect Behavior and Apparently Instructed Her to Tell Him to Contact a Lawyer.**

When Goettsche was arrested, he was overheard directing his wife to "call [Subject 1]." While Goettsche labels this person as his "accountant," this characterization is incomplete. Subject 1 has worked with Goettsche to set up

27

entities and accounts domestically and overseas, which have been used to receive millions of dollars. For example, in April 2017, Goettsche emailed Subject 1 and directed him to start a "new NV entity," which he clarified would be "used to fund *above board* investments." *See* USA Ex. G (emphasis added); *see also* USA Ex. H, (May 1, 2017 email in which Goettsche acknowledged that Subject 1 "has set up dozens of entities for me . . . I trust him fully so feel free to disclose all details of these deals"). It also appears that Goettsche involved or attempted to involve Subject 1 in BCN. Goettsche offered Subject 1 "double the price of what you normally charge for taxes" to get involved in "an INSANE project" in which he is "building a membership club around mining for" bitcoin and would "do $10-$15 million . . . from now until the end of the year." *See* USA Ex. I (Sept. 8, 2014 email). Subject 1 also appears to have advised Goettsche of a plan to conceal money for Goettsche's business partner, Defendant Two. Subject 1 discussed Defendant Two's "situation" in "the states," suggested that Defendant Two transfer money through a lawyer, and noted that Subject 1 "could then prep and file all returns, but [ ] would not sign them professionally so they can't come after [Subject 1] for any additional information or professional liability," noting further that he did not "think the agency will want to dig deeper into the sourcing of his money so long as we match up all reported sources on his returns." *See* USA Ex. J (May 17, 2017 email). Goettsche also communicated with Subject 1 on Telegram—an end-to-end encrypted messaging app—and Proton mail, a foreign email service.

This was the person who Goettsche directed his wife to call and instruct to, in turn, contact a lawyer. Goettsche does not explain why he told his wife to contact Subject 1 as opposed to contacting the lawyer directly, but in light of the above, one cannot help but think this instruction was given in light of Subject 1's significant insight into Goettsche's finances and entities around the world. At the same time, in another location, Subject 1 was speaking to law enforcement about his relationship with Goettsche. During the interview, Goettsche's wife— as instructed by Goettsche—called Subject 1. Thereafter, the demeanor of Subject 1 changed significantly, Subject 1 called a lawyer as instructed by Goettsche's wife, and, upon hearing back from the lawyer, Subject 1 ended the interview.

> ### c. Goettsche's Mother Was Hesitant to Disclose to Law Enforcement That Goettsche's Brother Was in Her Home.

Finally, on the day of the takedown, law enforcement knocked on the door of what Goettsche's mother's home. Brother was inside, and his car was parked outside the home. Goettsche's mother went back and forth with law enforcement several times before acknowledging that her son was in the house only after law enforcement pointed out that they recognized his car in her driveway.

Goettsche's mother acted within her rights, but this encounter is nevertheless relevant to assessing whether Goettsche's family ties would suggest that he will abide by conditions of release. Beyond her hesitation in her dealings with law enforcement on December 10, 2019, there is a reasonable concern that

Goettsche's mother will not serve as an appropriate deterrent because both Goettsche and Brother are potentially implicated in the scheme.

> **2.   Goettsche's Tremendous Access to Wealth—Much of Which Law Enforcement Has Not Been Able to Locate or Seize—Necessitates Pretrial Detention.**

Throughout the course of his illegal activity, Goettsche has moved money around through a complicated web of cryptocurrency exchanges, entities, and foreign and domestic bank accounts. It appears that he has also likely used proceeds of his fraud scheme to fund and invest in other companies, making tracing and seizure even more challenging. Goettsche's access to wealth—distributed all around the world—is extraordinary and ensures that no combination of conditions could negate his flight risk.

> **a.   Cryptocurrency Cold Storage Devices Recovered from Goettsche's Home Reflect That Goettsche has had Access to Significant Funds.**

Law enforcement recovered several cold storage devices from Goettsche's house on December 10, 2019. A cold storage wallet is an offline wallet that can store cryptocurrencies. Law enforcement seized approximately $500,000 in cryptocurrency from the cold storage wallets.

However, there is reason to believe that Goettsche has used these cold storage wallets to secure access to and transfer significantly more funds than what law enforcement was able to seize on December 10. Law enforcement has used software to recreate the transfers of cryptocurrency that were sent from and received by these cold storage wallets. This process has revealed that the

cold storage wallets found in Goettsche's home (1) received approximately $217 million worth of bitcoin, valued at the time of the incoming transactions, and (2) transferred out approximately $233 million worth of bitcoin, valued at the time the funds left the cold storage wallets. A significant percentage of the funds that were transferred out of the cold storage wallets were sent—directly or indirectly— to approximately 10 cryptocurrency exchanges, as well as to wallets controlled by unidentified persons or entities. Although analysis is ongoing, it appears that, from December 2017 through January 2018, one of the cold storage wallets seized from Goettsche's home received approximately 5,000 bitcoin, worth approximately $70 million, from one of the wallets that BCN used to accept investment from its victims.

In response, Goettsche claims that because the Government has these cold storage wallets in its possession, the Government now controls this wealth. GB17. While that is so for the funds in the cold storage wallets at the time of the arrest, it does not control the more than $200 million that previously passed through these wallets. Although Goettsche knows where he transferred this significant amount of cryptocurrency, the Government has significantly less visibility. Goettsche claims that his cryptocurrency "transactions are much more transparent than bank transfers in the traditional financial system because they are always available to the public and traceable in real time on the internet." GB16. But, as Goettsche knows, cryptocurrency protocols effectively anonymize financial transactions. Although one can observe funds being moved from one

31

wallet to another (and another, and another, as the case may be), unlike the "traditional financial system," information about who controls a particular wallet is not always available. Unless associated with an exchange or some other known individual or entity, a wallet is identified by its random alphanumeric code and nothing else. In other words, there is over $200 million worth of cryptocurrency that Goettsche previously controlled but was not seized by law enforcement. This access to wealth is a flight risk.

**b.    Goettsche Has Several Cryptocurrency Exchange Accounts.**

In addition to maintaining cold storage wallets, Goettsche also utilized several different accounts with cryptocurrency exchanges, both foreign and domestic. A cryptocurrency exchange, among other things, allows one to swap out cryptocurrency for fiat currency. It appears that Goettsche utilized several different cryptocurrency trading accounts and several different cryptocurrency exchanges. As Goettsche explained to itBit, a New York-based financial services company that trades and provides custody services for cryptocurrencies, Goettsche has been engaging in cryptocurrency mining in several cryptocurrency pools, has "several trading accounts on just about all of the exchanges," and when asked about which third-party bitcoin wallets Goettsche utilizes, he responded "ALL OF THEM!" USA Ex. K (Oct. 11 2016 email from Goettsche to itBit). Based on the investigation to date, it appears that Goettsche has maintained accounts, directly or indirectly, as follows:

32

- Goettsche has maintained an account with Xapo, which is a Hong Kong-based company with a U.S. subsidiary that provides bitcoin wallets, a cold storage vault, and bitcoin-based debit cards. From 2014 through 2017, Goettsche received at least 726 BTC-the equivalent of approximately $303,848.51 into this account.

- Goettsche has maintained an account with Poloniex, which is a U.S.-based digital asset exchange involving cryptocurrency.  From 2017 to 2018, Goettsche received approximately 1,729 BTC, approximately $1,459,688-in transfers.  According to a screenshot of Goettsche's account taken in December 2017, the estimated value of Goettsche's holdings with Poloniex was worth 612.70167267, or approximately $9,437,211.04 in U.S. dollars.  *See* USA Ex. L (Dec. 27, 2017 Poloniex account screenshot).

- Goettsche has maintained an account with Gemini Trust, which is a New York-based digital asset exchange.  From 2015 to 2017, Goettsche received approximately 2,569.8 BTC, or about $3,025,460.68 in U.S. dollars into this account.

- Goettsche has maintained an account with Coinbase, a San Francisco-based digital currency exchange.  From 2014 to 2017, Goettsche received approximately 3,695.189701 BTC, or about $2,098,406.12 in U.S. dollars.

- Goettsche has maintained an account with itBit, and from October 2015 through March 2019, the account received at least 783.7 BTC, or about $1,747,541.06.

- Goettsche has maintained one or more accounts with Bitfinex, which is headquartered in Hong Kong and registered in the British Virgin Islands.  From 2018 to 2019, Goettsche liquidated approximately $2,972,4795 worth of cryptocurrency out of his account(s) with Bitfinex.

Obviously, a defendant's use of several different accounts scattered around the world—particularly in countries where the U.S. Government does not have the ability to timely obtain records or seize funds—presents a risk of flight. And, again, the number of different accounts, both foreign and domestic, and the amount of cryptocurrency that has passed through these accounts, which

33

appears to be a limited snapshot as opposed to a complete accounting, renders Goettsche a flight risk.

### c. Goettsche Engaged In Several Money Transfers Through Several Different Bank Accounts, AU Card, Entities, and Law Firms.

In addition to the above, Goettsche moved money through multiple corporate entities, bank accounts, and a high-end card service through the course of the scheme. To date, the Government has only been able to seize approximately $9.7 million from Goettsche, which appears to reflect a mere fraction of his access to wealth. Because Goettsche has utilized several different entities and accounts around the globe, neither the Government (nor this Court) knows the full scope of Goettsche's wealth.

- Goettsche created Getch Holdings LLC and there appear to have been several transfers through this entity, including the following:

    o In January 2018, a wire transfer of approximately $2.497 million was transferred from a company in the British Virgin Islands—believed to be associated with Bitfinex—to an RBC Wealth Management account for Getch Holdings LLC;

    o From February 2018 through July 2018, Getch Holdings LLC received nine incoming wire transfers totaling approximately $22.8 million from Lantau Peak Trading in Hong Kong held at a China Construction Bank Corporation, which also is believed to be from Bitfinex.

- Bank records show that approximately $18.7 million was deposited to accounts either controlled by Goettsche, on behalf of Goettsche or at the request of Goettsche from a prepaid credit card service called "AU Card." AU Card is a prepaid credit card with concierge services for high net worth individuals. During the period from March 2018 through December 2019, Goettsche authorized wire transfers from his AU Card account totaling more than $100 million. More than $60 million of

these wire transfers appear to have been funded through the liquidation of cryptocurrency.

- o    In addition, it appears that Goettsche deposited several millions of dollars from his AU Card account into a bank account in the name of Bitwealth Holdings. Goettsche is listed as the contact person from the company, which lists the primary business as being personal funds for personal investments. From February 2018 through October 2019, approximately $9.9 million was deposited into this account, the majority of which came from Goettsche's AU Card account.

- Goettsche maintained an account with Wells Fargo in the name of entity Getch Inc. The day before the takedown, on December 9, 2019, Goettsche deposited $2.5 million into this account from his AU card. Other deposits into this account have included approximately $3.8 million from an account that was partially funded with deposits related to cryptocurrency investment and cryptocurrency exchanges.

- During the period January 30, 2018 through November 20, 2018, Goettsche deposited approximately $28.5 million to a brokerage account he controlled at RBC Wealth Management in the name of Getch Holdings through a series of twelve wire transfers. The source of these transfers was from Bitfinex, the cryptocurrency exchanger referenced above. The transfers from Bitfinex to RBC Wealth Management were made through three international bank accounts that Bitfinex controls—Lantau Peak Trading, Amazing Partners Limited and an account at Sackville Bank and Trust.

- As deposits came in to the account from Bitfinex, Goettsche began making disbursements out of his Bitfinex account. In total, these disbursements come to approximately $23 million. Some of these payments out of the account include:

  - o    Approximately $6.7 million for the purchase of real estate and other business investments, including real estate in Belize, interest in a currently operational fitness club in Las Vegas, Nevada and purchase of two Colorado commercial properties that were planned to generate rental income.

  - o    Approximately $4.2 million to a company that provides tax consulting services.

- o   Approximately $4.6 million in transfers to other Goettsche accounts at RBC Wealth Management.

- In 2018, Goettsche had an interest in an account with OSL that contained $9 million as the high balance for that year. OSL is a company in Hong Kong and is related to Octagon Strategy Limited. Octagon Strategy Limited made several wire transfers to Cryptowatt, a bitcoin mining equipment company of which Goettsche was the CEO. It appears that a total of approximately $81 million has been transferred from Octagon Strategy to Cryptowatt. It also appears that Goettsche controls and/or has access to the resources of this account.

- Goettsche has at least two accounts with Commerzbank in Frankfurt, Germany in the name of Bitchain GMBH and Subject 1 is the named principal on the accounts (the "Bitchain GMBH Accounts"). From August 2017 to October 2018, the Bitchain GMBH Accounts received four wire transfers totaling approximately $7.55 million that are notable:

  - o   Approximately $950,000 from Law Firm 2
  - o   Approximately $3,200,000 from an AU card account
  - o   Approximately $2,000,000 from a Law Firm 1 account
  - o   Approximately $1,400,000 from another Law Firm 1 account

- Law Firm 1 and Law Firm 2 appear to have run at least $26 million of money owned directly or indirectly by Goettsche through the course of the scheme.

Goettsche's use of several different bank accounts, entities, and mediums of currency to transfer his wealth derived from this illegal scheme all around the world makes him a significant flight risk and makes it likely that, if released, he will continue to use undiscovered funds to either escape prosecution or to further profit from his illegal fraud.

       **d.**      **The Cases Goettsche Cites Are Distinguishable Because Those Defendants Did Not Move Their Money Around Several Different Entities and Accounts Around the World Making it Difficult to Trace.**

In response to the Government's argument that Goettsche's access to hundreds of millions of dollars makes him a flight risk, Goettsche's brief reclassifies the Government's emails, seized evidence, and other tracing analysis outlined above as mere "speculation." Goettche also collapses the Government's concerns into an overly simplistic cry that it must be the case that all rich people must be detained pretrial. Goettsche, obviously, is wrong.

It is not the case that all rich defendants must be detained pretrial. However, it is also not the case that where, as here, a defendant has used several different cryptocurrency exchanges, foreign and domestic bank accounts, and foreign and domestic entities to conceal his illegal conduct and ill-gotten gains, that defendant can simultaneously seek pretrial release from the Court without presenting as a significant flight risk. This distinction is clear even in the cases to which Goettsche relies on in his brief.

For example, in *United States v. Dreier*, 596 F. Supp. 2d 831 (S.D.N.Y. 2009), GB18, Judge Rakoff determined that there were conditions of pretrial release (far more onerous than what Goettsche has proposed here) that could reasonably assure his presence in Court, in large part, because a receiver appointed in a parallel SEC enforcement action determined that *the defendant himself* had provided records that accounted for the majority of the defendant's

money. *Id.* at 832. Indeed, prior to the receiver coming to that conclusion, the defendant was ordered detained because there was a concern that there were "tens of millions" of dollars the defendant received from the fraud that was unaccounted for. *Id.* As part of his pretrial release conditions, Judge Rakoff required the defendant to, among other things, eliminate all computer access and continue to work with the SEC receiver to "identify[ ] and preserv[e] all assets held directly or indirectly by the defendant." *Id.* at 833. Notably here, and in contrast to *Dreier*, Goettsche has made no attempt to provide law enforcement with an accurate accounting of his financial holdings, much less taken steps to help secure the funds he received from his fraud scheme for the benefit of investors.

Similarly, in *United States v. Harry*, Crim. No. 19-246 (D.N.J. 2019) (ECF No. 85), the defendant represented to the Court that he was not a flight risk because the Government had frozen all of his financial accounts and expressly denied that he had access to significant funds in offshore accounts or elsewhere. *See* GB12, 16, & Ex. D to Goettsche Br. at 4, 6. Here, as highlighted above, there is substantially more than mere speculation that Goettsche has overseas cryptocurrency exchange accounts and more traditional bank accounts, and there is the added layer—apparently not present in *Harry*—that Goettsche has funneled his illegal proceeds through a web of entities, lawyers, and other businesses, complicating further his flight risk. Without more knowledge about the international locations in which Goettsche has hidden or maintains access

to illegally obtained money, this Court cannot possibly appropriately evaluate whether Goettsche's proposed bail package will have any deterrent effect on his risk of flight.

Goettsche's citation to *United States v. Griffith*, Crim. No. 20-15 (S.D.N.Y. 2019) (ECF No.12), GB16 & Ex. E to Goettsche Br., for the proposition of releasing a defendant who has "vast international assets and financial resources" actually highlights further why Goettsche should be detained instead of released. First, the defendant in *Griffith* was not accused of a large-scale fraud scheme that spanned several years in which he took money from victims all around the globe.[1] Second, it appears from the transcript that the defendant in *Griffith* did several things that Goettsche has not. For one, it appears that the defendant in *Griffith* represented to the Court that he had accurately disclosed his cryptocurrency holdings to Pretrial Services, where Goettsche declined to discuss his finances with the Pretrial Services Office in Colorado and provides no further color in his brief. *See* GB Ex. E at 17-18. Additionally, it appears that the amount of cryptocurrency holdings that the *Griffith* defendant had was, at its highest, less than or approximately $1 million, not hundreds of millions of dollars to which Goettsche has had access. *Id.* at 17-18, 29.

---

[1] Notably, the *Griffith* defendant's estimated sentencing guidelines range was between 15 to 21 months' imprisonment. *See* Ex. E to Goettsche Br. at 32. Here, the Government's current estimate of Goettsche's sentencing range is between 235-293 months' imprisonment—over 10 times the sentencing exposure in *Griffith*.

Goettsche's reliance on *United States v. Bodmer*, Crim. No. 03-947, 2004 WL 169790 (S.D.N.Y. 2004), is similarly misplaced. *Bodmer* involved a Swiss national accused of money laundering and foreign bribery allegations—not stealing millions of dollars from other people. *Id.* His net worth was significantly lower than Goettsche's—approximately $2.4 million—and the Government in *Bodmer* (as opposed to here) had no evidence to suggest that Bodmer had accounts or undisclosed assets. *Id.* Finally, wholly absent here, the Court in *Bodmer* determined that if Bodmer fled to Switzerland, he would be ruined professionally, *id.* at *3; in this present case, the opposite is likely true—recall Balaci's statement regarding Goettsche's "skill" at creating pyramid schemes.

Goettsche's reliance on the *Hansen* and *Benhamou* cases do not shed additional light on his arguments. In *United States v. Hansen*, the Sixth Circuit apparently reviewed and affirmed a release order that required an alien to reside in a country from which he could not be extradited. 108 F. App'x 331 (6th Cir. 2004). The Court, in holding that the "bail statute does not . . . require that foreign defendants be detained simply because their return cannot be guaranteed through extradition," did not analyze whether a wealthy defendant with assets and victim money scattered in accounts around the world presents a flight risk or danger of safety to the community. *Id.* And there is no publicly filed opinion available in *United States v. Benhamou*, which appears to be an insider trading case in which the defendant waived extradition and cooperated with the Government.

40

The *Madoff* case cited to by Goettsche is also not helpful to this Court in determining whether appropriate conditions of pretrial release can be fashioned in this case. The *Madoff* case did not involve a large-scale international cryptocurrency scheme and in *Madoff* the Government was able to get some comfort from the defendant to come to an initial agreement that there were conditions of pretrial release that could address the risks identified by the Bail Reform Act.  In other words, bail was not contested in *Madoff* until, after reaching these agreed-upon conditions with the Government, Madoff subsequently sent various "gifts" (his assets) to people, which caused the Government to seek revocation of his pretrial release. Here, the Government does not believe—from the outset—that there are any conditions that will appropriately ensure Goettsche is not an unreasonable flight risk or a danger of safety to the community.

### 3. Goettsche's Substantial International Ties—Including His Longstanding Business Partner Who Remains At-Large in a Non-Extraditable Country—Cuts in Favor of Detention.

In addition to tremendous wealth, Goettsche has significant international ties. More than just travel—Goettsche orchestrated BCN through a web of international contacts (many of whom likely have incentive to help Goettsche escape U.S. prosecution). His significant travel and foreign properties—including *a private island*—cut against pretrial release.

Goettsche has purchased several foreign properties through the course of this scheme. For example, he purchased Hatchet Caye (now known as Ray Caye)

Island and Hatchet Caye Resort in Belize for approximately $6.4 million in late 2017, which he appeared to procure by funneling transactions through Law Firm 1. *See* Ex. M ("If [Law Firm 1] 'gifts' Hatchet Caye Limited and Argo Services Limited to Matt G, will funds still be sent to Belize via his company [Law Firm 1]?"). From late 2017 through October 2019, Law Firm 1 has sent wire transfers totaling approximately $7,598,108 to Hatchet Caye Ltd Atlantic Bank in Belize.

Indeed, Goettsche joked about how he was planning to make this island in Belize "his own country" with "citizens" having "blonde hair and blue eyes":

| 10/17/2017 | INDIVIDUAL | Doty man said you picked up that island. Congrats brotha |
| 10/17/2017 | GOETTSCHE | yes sir |
| 10/17/2017 | GOETTSCHE | big pimping on my own island bro |
| 10/17/2017 | GOETTSCHE | planning to make it my own country |
| 10/17/2017 | GOETTSCHE | and looking for citizens |
| 10/17/2017 | INDIVIDUAL | haha, well let me know and I'll submit my application LMAO |
| 10/17/2017 | GOETTSCHE | we are going to do it like they did Iceland |
| 10/17/2017 | GOETTSCHE | rape and pillage some villages looking for blonde hair and blue eyes |
| 10/17/2017 | INDIVIDUAL | absolutely, keep the blood line pure |
| 10/17/2017 | GOETTSCHE | lol you know it |
| 10/17/2017 | INDIVIDUAL | is it sick? I know you went down there to check it out |
| 10/17/2017 | GOETTSCHE | its so sick! |
| 10/17/2017 | GOETTSCHE | ill show you a video next time we hang |
| 10/17/2017 | INDIVIDUAL | word looking forward to it |

Goettsche has used the Belize property to host people with tremendous resources and international ties, including Sir Richard Branson. *See* Ex. N (June 1, 2018 draft email re: Richard Branson).

42

In addition to the Belize island, Goettsche has two properties in Costa Rica. He also has a fractional interest in condominium in St. Kitts, apparently shared with codefendant Jobadiah Weeks. Through this St. Kitts purchase, Goettsche purchased and applied for St. Kitts citizenship for him and his family. *See* Ex. O (Economic Citizenship Agreement with St. Kitts); *see also* GB9-10. Goettsche also has bank accounts in Belize, St. Kitts, Costa Rica, and several accounts in Germany. Many of Goettsche's properties appear to generate income, which means that if Goettsche were to flee to avoid prosecution, he could continue to receive substantial amounts of money from anywhere in the world by way of these properties.

In response, Goettsche argues that he applied for St. Kitts' citizenship because "many foreign-based digital currency exchanges, mining companies and other industry participants choose not to do business with U.S. citizens because of the lack of development of U.S. law and regulations regarding digital currency." GB10. Goettsche does not explain why he felt the need to place his fortune in these foreign cryptocurrency exchanges that are not U.S. friendly. Moreover, it appears from Goettsche's response to itBit—in which he acknowledged that he had accounts on many major cryptocurrency exchanges— that Goettsche did not need St. Kitts citizenship to participate in cryptocurrency exchanges. Further, Goettsche's purported cryptocurrency justification does little to answer why he sought citizenship for his family. *See* GB10 ("Goettsche applied for citizenship for his family").

If anything, Goettsche's dedication to placing his money in non-U.S. friendly exchanges and to work with other, in his words, "industry participants" that are not U.S. friendly—so much so that he *sought out a second citizenship* to accomplish it—does not cut in favor of pretrial release and highlights further that he presents  significant risk of flight—particularly, apparently, to countries and with the help of entities and "participants" who are not U.S. friendly. Additionally, although Goettsche cites *Griffith* for the proposition that the extradition treaty with St. Kitts was "considered in favor of release" in that case, there is no indication in either the transcript of the bail hearing nor the Court's order that Judge Broderick considered this as a "favorable" factor in determining pretrial release. *See* GB Ex. E at 32-56 (Court opinion and Order). That there is an extradition treaty with St. Kitts does not mean his travel to St. Kitts would be the same as if he traveled to Arizona—as the Court knows, once a defendant moves outside the United States, the Government's ability to locate him and his resources decreases significantly.

In addition to owning a private island, several other foreign properties, and attempting to gain foreign citizenship, Goettsche also has a history of significant foreign travel.  The following reflects records of some of Goettsche's international travel:

| Date | Arrival | Departure |
|---|---|---|
| 11/30/2019 | Colorado | Costa Rica |
| 11/24/2019 | Costa Rica | Colorado |

| 10/26/2019 | Colorado | Cabo San Lucas, Mexico |
| 10/19/2019 | Belize | Colorado |
| 10/7/2019 | Colorado | London |
| 9/29/2019 | Montreal | Florida |
| 8/6/2019 | Colorado | Belize |
| 7/29/2019 | Belize | Colorado |
| 5/29/2019 | Colorado | Belize |
| 5/20/2019 | Belize | Colorado |
| 5/12/2019 | Colorado | Goose Bay, Canada |
| 5/6/2019 | London | New Jersey |
| 4/20/2019 | Colorado | Mexico |
| 4/17/2019 | Mexico | Colorado |
| 3/20/2019 | Belize | Colorado |
| 1/6/2019 | Houston | Belize |
| 1/3/2019 | Belize | Colorado |
| 12/20/2018 | Colorado | Germany |
| 12/17/2018 | Germany | Colorado |
| 11/24/2018 | Florida | Bahamas |
| 11/18/2018 | Bahamas | Colorado |
| 11/5/2018 | El Paso | Mexico |
| 11/2/2018 | Mexico | Colorado |
| 8/16/2018 | Houston | Belize |

| 8/10/2018 | Atlanta | Jamaica |
|---|---|---|
| 6/18/2018 | Houston | Belize |
| 5/6/2018 | Miami | Macedonia |
| 4/17/2018 | South Padre Island | Belize |
| 3/29/2018 | Houston | Belize |
| 3/19/2018 | Germany | Denver |
| 2/21/2018 | Denver | London |
| 2/16/2018 | Iceland | Denver |
| 2/12/2018 | Houston | Belize |
| 1/8/2018 | Denver | London |
| 1/2/2018 | Germany | Denver |
| 12/4/2017 | Denver | Tokyo |
| 11/28/2017 | South Korea | San Francisco |
| 10/28/2017 | Los Angeles | Dubai |
| 9/20/2017 | Houston | Belize |
| 9/9/2017 | Denver | Germany |
| 8/4/2017 | Denver | Tokyo |
| 7/27/2017 | Hong Kong | Los Angeles |
| 6/21/2017 | Minneapolis/St. Paul | Iceland |
| 6/9/2017 | New York | Germany |
| 4/11/2017 | Dallas | Tokyo |
| 3/22/2017 | Denver | Germany |
| 12/11/2016 | Seattle | South Korea |

| 10/20/2016 | New York | Germany |
| --- | --- | --- |
| 10/10/2016 | Houston | Costa Rica |
| 9/30/2016 | Denver | Iceland |
| 6/30/2016 | Dallas | Hong Kong |
| 5/23/2016 | Seattle | South Korea |

Until his arrest, Goettsche appeared to have access to a private plane, registered in an account called Tango & Cash LLC. The price of this plane appears to have been purchased from an account in the name of Most Amazing Box LLC, which appears, in turn, to be funded by a Singapore-based cryptocurrency trading exchange. Getch Holdings, one of Goettsche's entities, pays for the insurance on this aircraft. Goettsche takes the position that he is selling this plane and no longer has access to it. GB14-15.

But in addition to this private plane, a second private plane, which law enforcement suspects is utilized by Defendant Two, appears to have been purchased through Law Firm 1. So, even if Goettsche were to relinquish access to his private plane, one of his coconspirators who is suspected to be located overseas and is not yet arrested is believed to have access to at least two other private planes, which Goettsche could also utilize in short order.

Gottsche takes the untenable position that his "frequent international travel" does not 'indicate any risk of flight from prosecution[.]" GB11. But common sense dictates that one who has built a global fraud with contacts and operations around the world, whose vacation homes include a private island,

47

and who has traveled with such frequency that he has procured and used a private plane to facilitate travel, is *unquestionably* a more significant risk of flight than someone whose life is actually centered around the community where they live. Here, Goettsche admits that the majority of his travel was for "purchasing mining equipment to support [the fraud scheme]," "to visit a BitClub Network data center," or in furtherance of "other business purposes." GB11. Goettsche's international ties make him a risk of flight.

### D.   Goettsche Will Present a Danger of Safety to the Community.

In addition to being a flight risk, Goettsche will present a danger of safety to the community given his ability to recreate this or a similar fraud scheme just as anonymously from anywhere around the world in short order, all with the benefit of fraudulently obtained investor money. In this Circuit, "a defendant's propensity to commit crime generally, even if the resulting harm would be not solely physical, may constitute a sufficient risk of danger to come within the contemplation of the [Bail Reform] Act." *United States v. Provenzano*, 605 F.2d 85, 95 (3d Cir. 1979); *see also United States v. Schenberger*, 498 F. Supp. 2d 738, 742 (D.N.J. 2007) ("The concept of 'safety' may include non-physical harm."); *United States v. McIntyre*, Crim. No. 16-13 (KM), 2018 WL 385034, at *5 (D.N.J. Jan. 10, 2018) (affirming decision of Hammer, M.J., and citing *Schenberger* for this proposition).

Here, Goettsche has orchestrated and perpetuated a scheme that capitalized on individuals' being unfamiliar with cryptocurrency and the ability

to anonymously present a business that interacted with its victims nearly exclusively over the Internet. He was able to continue this scheme as long as he did because, in part, he remained anonymous behind the Internet as he convinced computer programmers to create the website programs that would allow him to run the ship and used tried and true multi-level marketing salesmen to bring his lucrative fraud scheme to the doors of unsuspecting victims around the globe. There is nothing stopping Goettsche from rebranding or tweaking the software programs used to create BCN and its many investment products under a different name and continue to defraud unsuspecting victims. Allowing Goettsche the opportunity to spin up another Internet fraud utilizing the same multi-level marketing/pyramid structure the he employed with BCN would pose a risk worldwide. It appears that BCN has targeted economically developing countries. And this is not a victimless crime. As explained by one victim in an email to BCN's customer support:

> Once beeten [sic] twice shy.  With this ponzi sheme you got ( dubed thousands of people from my country Cameroon including me , now you send me messages are u really serious????. U shall rot in hell for the amount of people you rendered homeless and frusterated in prisons . U will die likea fowl.  Nemsiss will catch up with you[.]

To date, the Government has received information from over 1,500 victims of Goettsche's scheme from all around the world. Goettsche's proposed bail package does almost nothing to ensure that he will not continue to engage in this fraud or further spend victim money. Indeed—the tone of Goettsche's brief suggests that he thinks he did nothing wrong.

49

**CONCLUSION**

For all of the reasons set forth above, the Government submits that the Court should detain Goettsche without bail pending trial.

Respectfully submitted,

CRAIG CARPENITO

s/ Jamie L. Hoxie

By:   Jamie L. Hoxie
      David W. Feder
      Anthony P. Torntore
      Assistant U.S. Attorneys


Dated:      February 11, 2020

**CERTIFICATE OF SERVICE**

I certify that on February 11, 2020, I served opposing counsel with this brief and accompanying exhibits by emailing the materials to counsel of record.

s/ Jamie L. Hoxie
Jamie L. Hoxie
Assistant U.S. Attorney

51