# EXHIBIT A

2020 WL 1467146
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

UNITED STATES OF AMERICA

v.

EMMANUEL BONAFE, Defendant.

19-CR-862 (VEC)
|
Filed 03/26/2020

ORDER

VALERIE CAPRONI United States District Judge

**\*1** WHEREAS on January 30, 2020, the Court denied Defendant Emmanuel Bonafe's motion for reconsideration of his pretrial detention, Hearing Tr. (Dkt. 90) at 42;

WHEREAS the Court found that "no condition or combination of conditions will reasonably assure ... the safety of any other person and the community," 18 U.S.C. § 3142(e)(1), based on the Government's proffer that Mr. Bonafe has been a high ranking member of the Latin Kings, who has professed access to firearms and has participated in multiple assaults and robberies, *see* Hearing Tr. at 42;

WHEREAS Mr. Bonafe has submitted a second motion for reconsideration of his detention based on audio recordings received during discovery, which in Defendants' view, show that one of the assaults discussed at the hearing was not a "slashing" (the term used at the hearing) because a knife might not have been used during the attack, *see* Exs. 1, 3; [1]

WHEREAS Mr. Bonafe also seeks reconsideration based on the COVID-19 outbreak, which has reportedly hindered his access to the law library and his ability to review materials produced during discovery, *see* Ex. 3;

WHEREAS Mr. Bonafe has waived his right to appear at a hearing and has requested that his motion be decided on the papers; and

WHEREAS Mr. Bonafe, due to the nature of the crimes charged in the indictment, faces a rebuttable presumption that "no condition or combination of conditions will reasonably

assure the appearance of the person as required and the safety of the community," 18 U.S.C. § 3142(e)(3);

IT IS HEREBY ORDERED that Mr. Bonafe's renewed application is DENIED. After reviewing the audio recordings and considering all of defense counsel's arguments, the Court continues to find that no condition or combination of conditions of release will reasonably assure the safety of the community, and that Mr. Bonafe has not rebutted the presumption of detention. Even if one of the assaults for which Mr. Bonafe was present (and likely participated in) did not involve a knife, a fact that is far from clear in the audio excerpts, the record continues to show that Mr. Bonafe is a high-ranking and influential member of a violent organization, who has himself participated in robberies and other acts of violence. *See, e.g.,* Hearing Tr. at 25–29. The Court further finds that the impact of COVID-19 on Mr. Bonafe's ability to review discovery materials in the law library does not compel his release; he is directed to raise his right to review discovery in his case to the legal staff at his facility, and his counsel may file a letter motion with the Court if the issue remains unresolved. Defendant's remaining arguments were advanced and considered at the prior hearing and require no further exposition.

**SO ORDERED.**

Ex. 1

**raiser&kenniff**

ATTORNEYS AT LAW

**\*2  Steven M. Raiser**

Thomas A Kenniff

Ethan D. Irwin

Anthony V. Falcone

Nipun Mawaha

300 Old Country Road, Suite 351

Mineola, New York 11501

Tel. 516-742-7600 • Fax 516-742-7618

Of Counsel

Edward Fregosi

John J. Rivas

Amy Sklar

**Patricia A. Craig**

Anthony J. Colleluori

E. Gordon Haesloop

Bruce R. Connolly

March 24, 2020

**VIAECF**

Hon. Valerie E. Caproni

United States Courthouse

Southern District of New York

40 Foley Square, Room 240

New York, NY 10007

Re: United States of America v. Emmanuel Bonafe Indictment No.: 19-00862-6 (VEC)

Second Letter Motion to Reconsider Detention Order, in Light of New Evidence and **COVID-19** Pandemic

Dear Judge Caproni:

I am the attorney for Emmanuel Bonafe, a defendant under Indictment 19-00862-VEC-6. Mr. Bonafe was arraigned, in front of Magistrate, Hon. Barbara C. Moses, on December 5, 2019 by Richard Rosenberg, CJA counsel. At which time a detention hearing was conducted and Mr. Bonafe was remanded. On January 30, 2020, I appeared before your Honor to request that Mr. Bonafe's **bail** be reconsidered. Our request was denied. I write to request that your decision of January 30, 2022, be reconsidered in light of information that

we have received during our review of the discovery provided to us by the Government.

During Mr. Bonafe's arraignment, the Court stated that he was being remanded, because of his being an alleged danger to the community. One of the key "acts of violence" relied upon by the Government and cited by the Magistrate at the initial retention hearing was regarding an alleged slashing involving an individual identified as Smiley (December 5, 2019 transcript at P30, Lines 16-19). Furthermore, at the **bail** reconsideration hearing held on January 30, 2020, the Court relied on the same rationale and the same information to deny Mr. Bonafe's **bail**. We are now asking your Honor to review this remand status again due to the fact that the information this Court relied on was incorrect in regards to this "slashing" was incorrect, or at very best, grossly overstated.

Telephone recordings clearly demonstrate that there was likely no slashing at all and if there was it did not involve Mr. Bonafe.

USAO_000055 (3:35-4:08) - call with Carmelo Velez – he, as a witness to the attack, indicates that it was Smiley who threw the first punch and it was Smiley who attempted to cut Bonafe (cutting his shirt).

USAO_000056 (3:05-3:20) – call with Smiley – Smiley states that he didn't know if the wound on his face was a slice or a punch. The wound was "very thin and then opened up."

Copies of these calls are attached for your review.

In light of this additional information and the ongoing **Covid-19** pandemic, leaving all incarcerated inmates at risk to contract the potentially deadly disease while living in closed quarters, we ask the Court to reconsider our **bail** application and release Mr. Bonafe on the **bail** package, pursuant to our request filed on January 23, 2020.

Sincerely,

/s/

Steven M. Raiser

Ex. 2

**U.S. Department of Justice**

*United States Attorney Southern District of New York*

**\*3** *The Silvio J. Mollo Building*

*One Saint Andrew's Plaza*

*New York, New York 10007*

March 25, 2020

**BY EMAIL**

The Honorable Valerie E. Caproni

United States District Court Judge

Southern District of New York

40 Foley Square

New York, New York 10007

**Re:** *United States v. Emmanuel Bonafe, a/k/a "Eazy,"* **19 Cr. 862 (VEC)**

Dear Judge Caproni:

We write in response to the defendant's March 24, 2020 motion for this Court to reconsider its order that the defendant be detained. This is the third time the defendant has moved for **bail**. The purported new evidence raised by the defendant is not, in fact, new. It is not only consistent with the representations previously made to the Court, but it is also incomplete. We respectfully request that the Court deny the defendant's renewed motion for release on **bail**.

### The Smiley Slashing

In the Court's January 30, 2020 **bail** hearing, the Government proffered evidence of multiple acts of violence the defendant was personally involved in as a high-ranking leader of the Black Mob. One of these was the slashing of a rival gang member named "Smiley" that occurred on June 10, 2017. The defendant contends that recorded telephone calls produced in discovery "clearly demonstrate that there was likely no slashing at all and if there was it did not involve Mr. Bonafe." Mot. at 2. This is false.

New York City Police Department ("NYPD") reports confirm that on the afternoon of June 10, 2017, the NYPD did in fact respond to 911 calls about an attack in Thomas Jefferson Park in Manhattan. When the police arrived, they found the victim, an individual who is known by law enforcement to go by the name "Smiley," with a laceration on the left side of his face, bleeding and in pain. On June 19, 2017, a cooperating witness ("CW-1") placed a recorded call to co-defendant Carmelo Velez, a/k/a "Jugg," the First Crown of the Black Mob. The defendant's motion selectively quotes only a portion of that call to suggest that Velez did not implicate the defendant. Contrary to the defendant's characterization, Velez clearly tells the cooperating witness that the defendant—known in the Black Mob by the alias "Eazy"—was involved in the attack.

When Velez described the attack to the CW-1, Velez clearly placed the defendant at the scene and involved, saying, "So, so now I walk, I'm with—Eazy's right next to me, so I'm like, 'Yo Smiley, leave that shit for another day bro. You know what I'm saying? We're here to show love. We're not trying to start no static right now. Alright bro.' I walk past, Eazy goes up to him like, 'Yo my n****, what's poppin'?' Cause Eazy heard he was talking shit. So he's like, 'Yo, um, you was talkin' spicy about me when you was locked up?' He was like, 'Yeah,' so Eazy's like, 'Alright, but why you never pop before?' "

Velez then continued to describe the attack itself, saying, "Cause what happened was we popped it off. Boom, boom, boom, boom—the whole mob jumping the n****. There was like fifteen of us. We cleaned this n**** out. N**** start rippin' em. Boom, boom, boom, boom, boom, but this is ... alright we jumped him first. He tried to run. Somebody caught him from behind and suplexed [PH] him off the top rope, boom! Hit the floor, n****s ripped 'em, bing, bing, boom, boom, and we started kickin' on top of the [UI]. Boom, boom, boom, boom, stomped him out. The widows was the one that came and was like, 'Stop! You're about to kill him.' We left that n**** bleedin', the eyes rolled back, swollen so his face could not see no more. Rips all over his fuckin' shit, convulging .... We finished the first time, cause we jumped him like three times, we finished the first time, his eyes were already pitch black bro. Ya understand what I'm tryin' to say? His eye was pitch black.' "

**\*4** Approximately two years later—on May 7, 2019—the defendant himself admitted his involvement in an attack on Smiley to a different cooperating witness ("CW-2").

CW-2 was wearing a recording device at the time. In that conversation, the defendant talked about a prior incident in which "that n**** Smiley was there with a big bandage on his face cause the shit, he just got, I just fired on the n**** the day before." And on December 18, 2018, the defendant sent a Facebook message about someone who had wronged him that read, "Imma do him like Smiley."

This evidence shows that, contrary to the defendant's motion, there *was* a violent slashing of a rival gang member named Smiley, and the defendant *was* involved in that slashing.

### Other Indications of Dangerousness

Of course the Smiley slashing was just one of the factors the Court considered when finding that there were no conditions of release that could reasonably ensure the safety of the community. The Government refers the Court to the transcript of the prior hearing for a more fulsome description, but this included the fact that the defendant served in high-ranking positions in the Black Mob, including the powerful position of Third Crown, also known as the "Warlord." It also included a number of acts of violence that the defendant committed in addition to the Smiley slashing, including multiple violent robberies and assaults; the fact that the defendant carried guns and told other Black Mob members that he had a machine gun to sell; and the fact that the defendant sold large amounts of oxycodone.

The defendant's criminal history also indicated that the defendant would be a danger to the community if released. He has repeatedly broken the law—even while on probation—and his lawful employment and family have not deterred him from selling drugs and committing violence. His history of defying court supervision and committing crimes even while on probation showed that there were no conditions of pretrial release that could reasonably assure the safety of the community.

### COVID-19

In the conclusion of his motion, the defendant briefly raises the issue of the COVID-19 outbreak. Though the defendant devotes no more than a single sentence to the issue, the Government is of course very aware of the impact this virus is having on our community in general and the prisons in particular. The defendant does not appear to have any

factors that make him high-risk, including age or pre-existing health conditions. Moreover, we understand that the virus has made pretrial supervision on **bail** more difficult, as Pretrial Services is experiencing a shortage of electronic monitoring equipment, and in-person visits create a risk of exposure. If anything, the current circumstances increase, rather than decrease, the risks that would be created by the defendant's release.

For these reasons and others, the Government requests that the defendant continue to be detained.

Respectfully submitted,

GEOFFREY S. BERMAN

United States Attorney

By [illegible text]

AUSA Adam S. Hobson

AUSA Elinor Tarlow

212-637-2484

Ex. 3

### RAISER AND KENNIFF, PC

300 Old Country Rd., Suite 351, Mineola, NY 11501

Hon. Valerie E. Caproni

United States Courthouse

Southern District of New York

40 Foley Square, Room 240

New York, NY 10007

Re: *United States v. Emmanuel Bonafe, a/k/a "Eazy,"* 19 Cr. 862 (VEC) Reply

Dear Judge Caproni:

The Government in their answer to our letter motion states,

New York City Police Department ("NYPD") reports confirm that on the afternoon of June 10, 2017, the NYPD did in fact respond to 911 calls **about an attack** in Thomas Jefferson Park in Manhattan. When the police arrived, they found the victim, an individual who is known by law enforcement to go by the name "Smiley," with **a laceration** on the left side of his face, bleeding and in pain

**\*5** There is no question that there was an attack. However, the above statement fails to demonstrate that the attack involved anyone cutting Smiley with a knife. There is nothing to demonstrate that the laceration was caused by a knife. As we indicated in our initial letter motion, Smiley himself was unclear how the altercation occurred and instead focused on the cut being thin. In fact, he indicates it was likely the result of being struck and that wound opened up from continued blows. In this case, there is no witness to say a knife was ever seen being wielded against Smiley and not a single witness that said that the wound itself was necessarily indicative of a knife wound.

Based upon the above, it is now clear that there is zero proof of a slashing being committed by Mr. Bonafe. The Government has offered no evidence to refute this. Instead, the Government goes on to talk generally about an attack. The Government states,

Velez clearly tells the cooperating witness that the defendant—known in the Black Mob by the alias "Eazy"—was *involved* in the attack.

By making this statement they are in essence conceding the lack of evidence regarding a slashing with a knife (not merely an physical confrontation), which they argued was evidence of his alleged dangerousness.

The Government then attempts to put significance on the fact that Mr. Bonafe was *present* during the fight with Smiley. This

is a far cry from proof of slashing someone with a knife. In this regard the Government states,

When Velez described the attack to the CW-1, Velez clearly placed the defendant at the scene and involved, saying, "So, so now I walk, I'm with—Eazy's right next to me, so I'm like, 'Yo Smiley, leave that shit for another day bro. You know what I'm saying? We're here to show love. We're not trying to start no static right now. Alright bro.' I walk past, Eazy goes up to him like, 'Yo my n\*\*\*\*, what's poppin'?' Cause Eazy heard he was talking shit. So he's like, 'Yo, um, you was talkin' spicy about me when you was locked up?' He was like, 'Yeah,' so Eazy's like, 'Alright, but why you never pop before?' "

There is nothing in that exchange to indicate anything other than mere presence at the scene of what turned into a fight. It does not speak to anything about Mr. Bonafe being involved in any way in a slashing. The Government goes on to quote, from that same call, stating virtually nothing about *Mr. Bonafe's involvement* either directly or indirectly in the beating of Smiley and again absolutely nothing regarding a slashing.

Velez then continued to describe the attack itself, saying, "Cause what happened was we popped it off. Boom, boom, boom, boom—the whole mob jumping the n\*\*\*\*. There was like fifteen of us. We cleaned this n\*\*\*\* out. N\*\*\*\* start rippin' em. Boom, boom, boom, boom, boom, but this is ... alright we jumped him first. He tried to run. Somebody caught him from behind and suplexed [PH] him off the top rope, boom! Hit the floor, n\*\*\*\*s ripped 'em, bing, bing, boom, boom, and we started kickin' on top of the [UI]. Boom, boom, boom, boom, stomped him out. The widows was the one that came and was like, 'Stop! You're about to kill him.' We left that n\*\*\*\* bleedin', the eyes rolled back, swollen so his face could not see no more. Rips all over his fuckin' shit, convulging .... We finished the first time, cause we jumped him like three times, we finished the first time, his eyes were already pitch black bro. Ya understand what I'm tryin' to say? His eye was pitch black.'

The Government then alleges that Mr. Bonafe, the day after the attack says, "I just fired on the n\*\*\*\* the day before." The Government wants to assume this means that Mr. bonafe struck Smiley at some point, but If you line this up with what the witness said in the previous conversation, it is more likely regarding what was *said* between the two and not a physical altercation. Again, nothing about Mr. Bonafe's use of a knife in any regard against Smiley.

**\*6** 'Yo, um, you was talkin' spicy about me when you was locked up?' He was like, 'Yeah,' so Eazy's (Mr. Bonafe) like, 'Alright, but why you never pop before?' "

Finally the Government indicates,

And on December 18, 2018, the defendant sent a Facebook message about someone who had wronged him that read, "Imma do him like Smiley."

This too admits nothing regarding a slashing or use of a knife. The Government has been given every opportunity to cite the evidence to support the allegation that Mr. Bonafe slashed Smiley, or that a slashing even occurred. This is a contention they used, without evidence to support it, to imprison Mr. Bonafe before a trial. In addition, to say "Imma do him like Smiley" also falls short of the promises made during the **bail** hearing. He is not quoted as saying, Imma gonna do him like **I did** Smiley. It is instead a threat of what he might do to Smiley in the future, that he will do to Smiley what was done to Smiley before, not that he was involved in what happened to him previously. Again, however you want to categorize it, there is nothing about a knife or a slashing in that statement either.

The Government then offers some additional allegations of dangerousness.

the defendant served in high-ranking positions in the Black Mob, including the powerful position of Third Crown, also known as the "Warlord."

multiple violent robberies and assaults; the fact that the defendant carried guns and told other Black Mob members that he had a machine gun to sell; and the fact that the defendant sold large amounts of oxycodone.

These accusations are based *solely* on a cooperating witness assertions. Mr. Bonafe was trailed and surveilled for years. There is no *evidence* to substantiate any of the assertions of the cooperating/interested witnesses. After years of surveillance and recorded conversations, including videos of meetings: there is not one controlled buy involving guns or drugs. There are no conversations admitting to drug or gun sales (only conversations stating what Mr. Bonafe *could* provide, nothing about him actually providing anything illicit) nothing about this alleged rank, no admissions. There are no videos showing Mr. Bonafe carrying a firearm, much less selling one. There was some speculation that a video did exist showing a sale of a machine gun this is in fact not the case

(as such, was not mentioned in the Government's answer to my letter motion).

All of the above should give this Court pause and should lead to an acknowledgment that the proof regarding his alleged dangerousness is based on very weak and sometimes non-existent evidence. The Government wants to then have the Court rely on his criminal history which is, I would argue, not significant.

The only charge involving a firearm occurred 10 years ago when my client was a teenager. The assault the Government cited was a bar fight that happened nearly 10 years ago. Nor does the fact that it happened at the tail end of probationary period indicate a danger to society so serious that no **bail** conditions could render society safe from him. We ask this Court to keep in mind, there has been 8 years that have passed with *no* supervision and there are no new arrests for assaults or the like.

**\*7** Finally, the Government speaks to <mark>COVID-19</mark>. When I wrote my initial motion, I did not believe anything more than the mention of this crisis would be needed to alert this Court to at least a serious consideration in releasing Mr. Bonafe. This is especially true in a case like this, where a key piece of evidence the Government set forth was exposed as insufficient to support their contentions for keeping him in remand status.

As to the very real crisis regarding <mark>COVID-19</mark>, every inmate is a risk to literally the entire prison population, including personnel. If one gets it, the potential to spread quickly is immense. This virus is dangerous for all those infected, not just those in a high-risk category. It also creates a large obstacle to Mr. Bonafe's ability to assist in his own defense. No one from my office can visit him. As the Government noted, in person visits create a risk of exposure and I have a young child at home and an elderly mother who is very involved in child care for my daughter. I cannot expose either of them to the conditions at the facility since there is a great likelihood that someone in that facility will contract the virus and potentially give it to me.

In addition, my client is no longer permitted library hours, which was the only time he could review the voluminous discovery in this case. Now he has nothing, no access at all. Furthermore, if the ankle bracelet is a prerequisite to his release then pre-trial services should make every effort to get one. We should not give up on the possibility that they could

do just that. In any event, this Court should consider that the **bail** package proposed by my office would be enough to ensure his return to court and the safety of the community. The danger right now is in confinement. Once he is out, he can isolate himself at his home for 2 weeks, along with his finance, as her parents care for their child.

Sincerely,

/s/

Steven M. Raiser

**All Citations**

Slip Copy, 2020 WL 1467146

Footnotes

1      The parties' submissions were not filed on ECF and were instead emailed directly to the Court. Neither side's submission contains a request for sealing. To promote public access to judicial documents, those submissions are attached herein as Exhibits 1, 2, and 3.

---

**End of Document**
© 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 1446895
Only the Westlaw citation is currently available.
United States District Court, D. Kansas.

UNITED STATES OF AMERICA, Plaintiff,

v.

HENRY CLARK, Defendant,

Case No. 19-40068-01-HLT
|
03/25/2020

Angel D. Mitchell, U.S. Magistrate Judge

## MEMORANDUM AND ORDER

 **\*1**  This matter comes before the court on Defendant Henry
Clark's Motion for Temporary Release from Custody (ECF
No. 144). On August 30, 2019, the court ordered Mr. Clark
detained pending trial, and he has been in custody since. Mr.
Clark now seeks temporary release pursuant to 18 U.S.C. §
**3142(i)** for what he contends are compelling reasons related
to the recent **COVID-19** global pandemic. (ECF No. 144.)
According to Mr. Clark, his present status in custody poses
a lethal threat to him because he is a diabetic and does
not have an opportunity for social distancing. The court is
sympathetic to his concerns, but Mr. Clark is not alone.
COVID-19 presents ongoing concerns for millions
of people, especially those with certain underlying medical
conditions. On balance, Mr. Clark has not shown a sufficiently
compelling reason that his release is necessary, particularly
in light of the court's prior finding that he is a flight risk
and a risk of harm to others. He has not made even a threshold
showing that his proposed release plan—which relies only on
isolated aspects of public health officials' recommendations
while ignoring others— would necessarily better address
his health concerns than if he were to remain in custody.
Furthermore, his proposed release plan would likely increase
the risk of harm to others. The court therefore summarily
denies Mr. Clark's motion.

## I. BACKGROUND

Mr. Clark is charged with conspiring to manufacture,
distribute, and possess with the intent to distribute substantial
quantities of fentanyl and heroin (and derivatives thereof). He
is the lead defendant in a nine-person indictment that alleges,
among other things, that these controlled substances resulted

in a user's death. (ECF No. 1, at 3.) On August 27, 2019,
he was arrested in Chicago. On August 30, he appeared for
a detention hearing in the Northern District of Illinois before
Magistrate Judge Maria Valdez. She ordered him detained
pending trial based on her finding that he poses a flight risk
and a risk of danger to the community. (ECF No. 49-3.)

Mr. Clark is currently housed at the Leavenworth Detention
Facility operated by CoreCivic, which is located in
Leavenworth, Kansas. He seeks an order for temporary
release from custody for what he contends are compelling
reasons—namely, that he is a 43-year-old insulin-dependent
diabetic, which he contends puts him at an increased
risk for contracting the SARS-CoV-2 virus and developing
complications from the disease it causes, COVID-19. He
notes that the Centers for Disease Control and Prevention
("CDC") identifies certain categories of individuals at a
higher risk of severe illness, including those with serious
underlying medical conditions such as diabetes. Mr. Clark
also states that his diabetes puts him at an increased risk
for contracting the virus (although, as explained below, he
lacks evidence to support this assertion). He also contends that
he does not have the option of adhering to CDC guidelines
recommending social distancing while he is incarcerated,
making an outbreak likely. And he questions the facility's
ability to effectively manage an outbreak. Among other
things, he notes that, while incarcerated, he has reported
blood-sugar levels over 300 mg/dL on multiple occasions
and that medical staff have struggled to address his diabetes.
He also states that his attorney contacted CoreCivic and was
advised that COVID-19 testing was not currently available at
the facility.

 **\*2**  Mr. Clark proposes that the court release him to his
residence in Chicago, where he previously resided with his
73-year-old mother. He states that his brother has agreed
to drive from Chicago to Leavenworth to pick him up and
transport him back home to Chicago.

## II. ANALYSIS [1]

Mr. Clark moves for temporary release pursuant to 18 U.S.C.
§ 3142(i) of the Bail Reform Act. It provides in relevant part
as follows:

> The judicial officer may, by
> subsequent order, permit the
> temporary release of the person,

in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be *necessary* for preparation of the person's defense or *for another compelling reason*.

§ 3142(i) (emphasis added). A defendant bears the burden of establishing circumstances warranting temporary release under § 3142(i). *See United States v. Buswell*, No. 11-CR-198-01, 2013 WL 210899, at \*5 (W.D. La. Jan. 18, 2013) (collecting cases).

Most courts addressing a motion for temporary release under § 3142(i) have done so in the context of evaluating the necessity of the defendant assisting with preparing his or her defense. *See, e.g., Buswell*, 2013 WL 210899, at \*5; *United States v. Dupree*, 833 F. Supp. 2d 241, 247 (E.D.N.Y. 2011); *United States v. Jeffries*, No. 3:10-CR-100, 2011 WL 182867, at \*4 (E.D. Tenn. Jan. 20, 2011); *United States v. Hazelwood*, No. 1:10 CR 150, 2011 WL 680178, at \*3 (N.D. Ohio Feb. 16, 2011); *United States v. Petters*, No. CR. 08-364(RHK/AJB), 2009 WL 205188, at \*2 (D. Minn. Jan. 28, 2009); *United States v. Birbragher*, No. 07-CR-1023-LRR, 2008 WL 2246913, at \*1 (N.D. Iowa May 29, 2008). This extends to the current COVID-19 pandemic inasmuch as at least one court has considered the pandemic's impact on counsel's difficulties communicating with the defendant. *See, e.g., United States v. Stephens*, --- F. Supp. 3d ---, 2020 WL 1295155, at \*2 (S.D.N.Y. 2020) (finding "the obstacles the current public health crisis poses to the preparation of the Defendant's defense constitute a compelling reason under 18 U.S.C. § 3142(i)").

There is limited authority as to when temporary release is justified under § 3142(i) based on "another compelling reason," although a defendant's medical condition may present that compelling reason in a particular case. *See United States v. Rebollo-Andino*, 312 Fed. App'x 346, 348 (1st Cir. 2009) (noting the defendant could seek temporary release under § 3142(i) for medical reasons). Courts have typically granted relief under § 3142(i) only "sparingly to permit a defendant's release where, for example, he is suffering from a terminal illness or serious injuries." *United States v. Hamilton*, No. 19-CR-54-01, 2020 WL 1323036, at \*2 (E.D.N.Y. Mar. 20, 2020). As but one example where a court has granted release based on medical issues, the district

court in *United States v. Scarpa* permitted the defendant to be released under the 24-hour guard of the United States Marshal Service ("USMS") at his own expense because the defendant had sustained a gunshot wound that destroyed his left eye and surrounding area of his face and skull, he would "shortly die" from terminal AIDS, and correctional authorities could no longer manage his medical conditions. 815 F. Supp. 88 (E.D.N.Y. 1993). In another case, a district court ordered the release of a defendant who had sustained multiple gunshot wounds, was partially paralyzed, could not walk, had lost some arm function, had a wound the size of a fist, and required 4-5 contracted security guards on a daily basis to supervise him; the Bureau of Prisons would not take custody of him because it could not provide the medical care that he required. *United States v. Cordero Caraballo*, 185 F. Supp. 2d 143, 144-47 (D.P.R. 2002). Therefore, Mr. Clark properly seeks relief based on COVID-19 concerns under the "necessary...for another compelling reason" prong of § 3142(i).

**\*3** Other district courts have considered COVID-19 concerns in the context of the more commonly used § 3142(f) pretrial detention framework, including the related subsections § 3142(e)(2)-(3) (statutory rebuttable presumptions) and § 3142(g) (Bail Reform Act factors). For example, the district court in *United States v. Martin* considered the defendant's argument concerning his medical conditions (asthma, high blood pressure, and diabetes) in light of the COVID-19 pandemic in a § 3142(f) analysis. 2020 WL 1274857, at \*4. However, the court appears to have considered this issue in the § 3142(f) analysis because the defendant raised the argument in that procedural context. *United States v. Stephens* is another case in which the district court considered speculative COVID-19 concerns—this time, in the context of a motion to reopen detention under § 3142(f) based on a change in circumstances. 2020 WL 1295155 at \*2 (reasoning that substantial challenges "would almost certainly arise" *if* there was an outbreak at the Metropolitan Correctional Center in New York City). But the court did not reopen detention based solely on COVID-19 concerns. Rather, the court first relied on new information that weakened the Government's case that the defendant possessed the firearm in question, and thus undermined the court's prior finding as to whether the defendant posed a danger to the community. *Id.* at \*1.

A defendant's concerns that he or she would face heightened COVID-19 risks if incarcerated would not typically factor into a § 3142(f) analysis, which focuses on whether the court

can fashion conditions of release that will reasonably assure the defendant is not a risk of nonappearance or a risk of harm to any others or the community. The risk of harm *to the defendant* does not usually bear on this analysis. Rather, whether a defendant's particular circumstances warrant release in light of the **COVID-19** pandemic ought to more properly considered on a case-by-case basis under the "another compelling reason" prong of § **3142**(**i**), as the district court did in *Hamilton*, 2020 WL 1323036, at *2. There, the court denied temporary release based on the **COVID-19** pandemic where the defendant was of advanced age and suffered from dementia and a history of stroke and heart attack because, among other things, there had been no reported incidents of **COVID-19** within the facility where he was being housed and the Bureau of Prisons "is taking system-wide precautions to mitigate the possibility of an infection within its facilities." *Id.* The mere possibility of an outbreak at the facility was not a compelling reason to justify his release. *Id.*

The court is mindful of the unprecedented magnitude of the COVID-19 pandemic and the extremely serious health risks it presents. But, in that context, a defendant should not be entitled to temporary release under § **3142**(**i**) based solely on generalized **COVID**-19 fears and speculation. Rather, the court must make an individualized determination as to whether **COVID-19** concerns present such a compelling reason in a particular case that temporary release is necessary under § **3142**(**i**). In making that determination, the undersigned will evaluate at least the following factors: (1) the original grounds for the defendant's pretrial detention, (2) the specificity of the defendant's stated COVID-19 concerns, (3) the extent to which the proposed release plan is tailored to mitigate or exacerbate other COVID-19 risks to the defendant, and (4) the likelihood that the defendant's proposed release would increase COVID-19 risks to others. The court will not necessarily weigh these factors equally, but will consider them as a whole to help guide the court's determination as to whether a "compelling reason" exists such that temporary release is "necessary." § 3142(i).

## B. The Original Grounds for the Defendant's Pretrial Detention

The court first considers the original grounds for the defendant's pretrial detention. *See Hamilton*, 2020 WL 1323036, at *1-*2 (first considering the rebuttable presumption under § 3142(e) before considering whether the **COVID-19** pandemic warranted temporary release under § **3142**(**i**)); *Buswell*, 2013 WL 210899, at *5 (observing

that "the facts surrounding the underlying reasons for the defendant's detention are relevant to the [§ **3142**(**i**)] analysis"); *see also Dupree*, 833 F. Supp. 2d at 247 (considering the circumstances leading to the defendant's revocation of pretrial release). After all, if a defendant is seeking temporary release under § 3142(i), the court has already found that pretrial detention was warranted on the grounds that, *e.g.*, no condition or combination of conditions would reasonably assure the defendant would appear as required and/or not pose a risk of harm to others. These reasons should be taken into consideration in determining whether a defendant has presented such compelling reasons for temporary release that they effectively override or at least sufficiently counterbalance the findings that originally justified the pretrial detention order.

**\*4** In this case, Mr. Clark is a high-risk defendant. The need for pretrial detention is not even a close call. Magistrate Judge Valdez originally ordered him detained pending trial because he was both a risk of flight and a danger to the community. These findings are amply supported by the record. He is the lead defendant named in an indictment where a grand jury found probable cause to believe that he and others were engaged in a drug-trafficking conspiracy case involving substantial quantities of fentanyl and heroin (and derivatives thereof) that resulted in the reasonably foreseeable death of an individual who died as a result of injecting the controlled substances manufactured as part of the conspiracy. He is facing twenty years to life in prison. As such, a rebuttable presumption arises under § 3142(e)(3)(A) that no condition or combination of conditions will reasonably assure his appearance or the safety of any other person or the community.

The evidence against him is strong. The indictment arose from a lengthy federal investigation of large-scale drug trafficking operation in Manhattan, Kansas, and the surrounding area, with ties to Wichita, Kansas City, Topeka, Chicago, and elsewhere. According to the Government's proffers, Mr. Clark is a Chicago-based drug trafficker who is the primary organizer/leader for the drug trafficking organization. (ECF No. 5, at 8.) Search warrants, surveillance, and eyewitness testimony revealed that he would bring drugs from Chicago, often traveling by Amtrak or bus, to the Manhattan area where he would sell them to local distributors and trade them with other co-conspirators for sex. (*Id.* at 14-17.) According to records obtained from law enforcement officers in Chicago, Mr. Clark is a suspected member of the Gangster Disciples Criminal Street Gang that engages in drug trafficking as its

primary revenue stream. (*Id.* at 18.) He is forty-three years old and has a violent criminal history spanning nearly his entire adult life. He has been convicted of attempted murder, aggravated battery with a firearm, possession of a firearm, felony unlawful restraint, domestic battery, and felony property damage. (*Id.*) On one prior occasion involving a confrontation with a law enforcement officer, Mr. Clark told the officer that he had been involved with guns and that he would "roll a mother f****r" (understood to mean he would use violent force). (*Id.*)

**C. The Specificity of the Defendant's Stated COVID-19 Concerns**

The court turns next to the defendant's stated COVID-19 concerns. Mr. Clark raises legitimate concerns about his underlying health conditions. He is a diabetic. Some people are at higher risk of becoming seriously ill from COVID-19, including those with serious underlying medical conditions such as heart disease, lung disease, and diabetes. *See* CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications.html (last visited Mar. 23, 2020). Citing the CDC's guidance, Mr. Clark misconstrues that this puts him at an increased risk for "contracting" COVID-19. However, there is currently no evidence to support this proposition. *See generally id.* (cited by Mr. Clark and discussing groups at risk for serious complications). "The problem people with diabetes face is primarily a problem of worse outcomes, not greater chance of contracting the virus." AMERICAN DIABETES ASSOCIATION, https://www.diabetes.org/diabetes/treatment-care/planning-sick-days/coronavirus. So it is more accurate to say that *if* Mr. Clark contracts the COVID-19 virus, his diabetes puts him at a "higher risk of getting very sick from this illness." CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications.html (last visited Mar. 23, 2020). He has therefore established a specific and particular concern that his status as a diabetic puts him at an increased risk for experiencing severe illness if he were to contract COVID-19.

**\*5** The remainder of his arguments about being incarcerated are general and speculative. Mr. Clark argues that he is at a greater risk of contracting COVID-19 given the lack of opportunity for social distancing at CoreCivic's Leavenworth facility. Unquestionably, avoiding crowds and social distancing are recommended to reduce the risk of transmission. *See* CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/get-ready.html (last visited Mar. 20, 2020) (setting forth steps to reduce the risk of transmission); THE PRESIDENT'S CORONAVIRUS GUIDELINES FOR AMERICA: 15 DAYS TO SLOW THE SPREAD, https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf (last visited Mar. 20, 2020) (recommending avoiding social gatherings of ten or more people). But Mr. Clark admits that he is unaware of any known cases of COVID-19 at the facility, and he instead argues that an outbreak is inevitable. (ECF No. 144.) This argument is speculative. The facility is reportedly taking reasonable recommended precautions, including having medical staff screen inmates during intake for COVID-19 risks, isolating those deemed to be high risk, and promoting other recommended hygiene habits.

CORECIVIC STATEMENT ON COVID-19 PROTECTION, https://www.corecivic.com/hubfs/_files/CoreCivic%20Response%20to%20COVID-1.pdf (last visited Mar. 23, 2020). It is implementing CDC and World Health Organization guidelines, purchasing COVID-19 test kits, communicating best practices for personal hygiene to prevent the spread, encouraging employees to stay home if they are ill, and developing plans to separate high-risk individuals who are more susceptible to COVID-19. *See* CORECIVIC: HOW CORECIVIC IS MANAGING COVID-19 https://www.corecivic.com/hubfs/_files/CoreCivic%20Response%20to%20COVID-1.pdf (last visited Mar. 23, 2020). Furthermore, it changed its visitation policies to suspend social visits and minimize in-person legal visits. *See* CORECIVIC: SOCIAL VISITATION SUSPENSION INFORMATION, https://www.corecivic.com/hubfs/_files/Visitation%20Suspension%20Info%20-%20Facility-wide.pdf (last visited Mar. 20, 2020). The court therefore finds his concerns about CoreCivic to be unsupported. *See, e.g., Hamilton,* 2020 WL 1323036, at \*2 (denying release where there had been no reported incidents of COVID-19 within the facility where the defendant was being housed and the Bureau of Prisons "is taking system-wide precautions to mitigate the possibility of an infection within its facilities").

The only datapoint Mr. Clark identifies in support of his argument that an outbreak is inevitable is his counsel's representation that she was advised by "medical staff" at CoreCivic that the facility does not have available COVID-19 testing. (ECF No. 144, at 3.) The motion does not identify the staff member or members or specify when the information was communicated to counsel, leaving the court with no way to evaluate the accuracy or timeliness of the information. But, even if the facility does not have COVID-19 testing available, that is an ongoing problem that is not unique to prison systems. *See, e.g.,* Robert Kuznia, *et al*, SEVERE SHORTAGE OF SWABS AND OTHER SUPPLIES HAMPER CORONAVIRUS TESTING, https://www.cnn.com/2020/03/18/us/coronovirus-testing-supply-shortages-invs/index.html (last visited Mar. 23, 2020). This is a problem in Chicago, too, which is where Mr. Clark proposes to go if he is temporarily released from custody. *See* Angie Leventis Lorgos, *et al.*, ADVOCATE HOSPITALS PAUSE DRIVE-UP CORONAVIRUS TESTING, CITING NATIONAL SHORTAGE OF TEST KITS, Chicago Tribune https://www.chicagotribune.com/coronavirus/ct-coronavirus-testing-suspended-advocate-hospitals-20200320-2kt3g6s3dnho3ctiffx2apg3ky-story.html (last visited Mar. 23, 2020).

**\*6** In sum, Mr. Clark's diabetes presents a specific COVID-19 risk, but the remainder of his arguments about incarceration are too speculative or generalized to favor release. Mr. Clark cannot predict the extent to which COVID-19 cases might arise at the facility any more than many Americans can predict how they might be exposed to the virus. He also cannot predict how CoreCivic might respond to an outbreak any more accurately than many Americans can predict how their local hospitals might respond. And while inmates may not be able to fully adhere to optimal social distancing guidelines, these circumstances are generalized to all individuals in the prison system and are not unique to Mr. Clark. He is at a facility that has implemented meaningful measures to try to minimize the likelihood of the virus entering the facility.

### D. The Extent to Which the Proposed Release Plan is Tailored to Mitigate or Exacerbate the Defendant's Overall COVID-19 Risks

The Bail Reform Act allows for temporary release only if the court determines that such release is "necessary" for a compelling reason. 18 U.S.C. § 3142(i). In the context of COVID-19, this means that the proposed temporary release plan should be tailored to mitigate the defendant's overall COVID-19 risks, not exacerbate them. Thus, the court evaluates the extent to which the proposed release plan is tailored to mitigate or exacerbate the defendant's overall COVID-19 risks.

Here, Mr. Clark's proposed release plan addresses only isolated aspects of public health officials' recommendations while ignoring other risk factors that would arise if he were released from custody. Mr. Clark has not set forth a record establishing that, even if someone at the facility were to contract COVID-19, CoreCivic is unprepared to contain the virus or care for those who may become infected. To the contrary, CoreCivic provides around-the-clock medical care, is staffed and trained to contain or treat the virus, and communicates with government partners and health agencies to keep those in its care safe and healthy. *See* CORECIVIC: HOW CORECIVIC IS MANAGING COVID-19, https://www.corecivic.com/hubfs/_files/CoreCivic%20Response%20to%20COVID-1.pdf (last visited Mar. 20, 2020). The record is void of any information suggesting that the facility would be unable to render appropriate medical treatment to defendant were he to become ill. Mr. Clark alleges that his blood sugar levels have been high while he is incarcerated, but he provides only conclusory allegations in this regard. He does not provide specifics for the court to evaluate the extent to which the facility (versus Mr. Clark himself) is responsible for not managing his diabetes and/or the extent to which his diabetes is under control. Thus, Mr. Clark's unexplained, conclusory allegations that he may have experienced negative outcomes managing his diabetes at some point during his incarceration does not rise to the level of justifying temporary release based on COVID-19 concerns.

Mr. Clark also does not address the extent to which his risks could be exacerbated if he returns to Chicago. He proposes home detention with GPS monitoring. However, he offers no evidence to explain how living with his mother mitigates the risk of infection. For example, he does not explain who else has or will live in or frequent the home or identify any screening practices or concrete COVID-19 precautions being taken there. He therefore offers nothing more than speculation that home detention would be less risky than living in close quarters with others at CoreCivic, which at least has screening practices and other reasonable COVID-19 precautions in place. He also does not address the risk of exposure while en route from CoreCivic's Leavenworth facility to Chicago, which is an eight-hour drive during which he and his brother would inevitably have to make occasional stops for necessities. And

he does not address, once there, the Chicago health care system's capacity to provide him with adequate treatment if he were to contract the virus. In contrast, if he remains at CoreCivic he has access to around-the-clock medical care, the facility is staffed and trained to contain or treat the virus if necessary, and it collaborates with government partners and health agencies to keep its employees and those in its care safe and healthy. CORECIVIC: HOW CORECIVIC IS MANAGING COVID-19, https://www.corecivic.com/hubfs/ _files/CoreCivic%20Response%20to%20COVID-1.pdf (last visited Mar. 23, 2020). CoreCivic has ample motivation to prevent any outbreak at the facility and, even if an outbreak occurs, to contain and manage it for the well being of all involved.

**\*7** On balance, the court is persuaded that this factor is neutral. It is speculative to predict whether Mr. Clark is safer in terms of his overall COVID-19 risks whether he is in custody or temporarily released to live with his mother in Chicago.

### E. The Likelihood that the Defendant's Proposed Release Plan Would Increase COVID-19 Risks to Others

In considering temporary release under § **3142**(**i**) based on circumstances related to **COVID-19**, it is also appropriate to consider the likelihood that the defendant's proposed release plan would increase **COVID-19** risks to others, particularly if the defendant is likely to violate conditions of release. A defendant who is unable to comply with conditions of release poses potential risks to law enforcement officers who are already tasked with enforcing shelter-in-place orders in many cities and counties, pretrial services officers who come into contact with the defendant for supervision, and others if that individual is taken back into custody.

In this case, these considerations do not support release. Judge Valdez originally detained defendant because he was both a risk of flight and a danger to the community. He is the lead defendant in a drug-trafficking conspiracy case where a grand jury found probable cause to believe that an individual died as a result of injecting the controlled substance manufactured as part of the conspiracy. Given the § 3142(f) and (g) considerations discussed previously, the court believes he will likely violate any conditions of release the court may impose if the court were to issue a temporary-release order. As another court observed:

> [w]hile the location monitoring that he proposed may offer useful information about where he is, it provides little useful information about what he is doing, and the ready accessibility of smart phones and digital communication devices would make it all too easy for him to resume his involvement (directly or through confederates) in the distribution of controlled substances without detection.

*Martin*, 2020 WL 1274857, at \*4. Here, Mr. Clark has been unable or unwilling to remain law-abiding for most of his adult life. The court has no reason to believe that he would suddenly become compliant now.

Meanwhile, supervising such a high-risk offender out in the community will place pretrial services officers at heightened risk of contracting the virus. "[L]ocation monitoring is not a limitless resource, nor is its installation and monitoring by the United States Pretrial Services officers without risk to those personnel (who must be trained and certified to install location monitoring) given the current recommendations regarding implementation of social distancing." *Id.* And, when Mr. Clark violates his conditions of release (as he likely will), law enforcement officers will be forced to expend valuable resources during a national crisis to take him back into custody in Chicago and return him to the District of Kansas, both increasing the risk to them of contracting and spreading COVID-19 and further increasing the risk to the prison population when he inevitably returns to the facility. *See* CENTERS FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/ coronavirus/2019-ncov/travelers/travel-in-the-us.html (last visited Mar. 19, 2020) (urging Americans to consider the risk of travel and noting that travel may put household contacts at an increased risk of contracting the virus). These additional considerations weigh in favor of denying the motion.

### III. CONCLUSION

**\*8** On balance, Mr. Clark has not established compelling reasons sufficient to persuade the court that temporary release is necessary. He has established only that his status as a

diabetic puts him at an increased risk for experiencing severe illness if he were to contract COVID-19. His arguments regarding the risk of an outbreak at his facility is speculative. Furthermore, he has not established that his proposed release plan would necessarily alleviate his overall COVID-19 risks. To the contrary, it appears that, if he were released, he simply would be trading one set of problems (*e.g.*, reduced opportunities for social distancing at CoreCivic) for another set of problems (*e.g.*, contamination risks associated with travel and being in an uncontrolled environment, and potentially reduced access to quality healthcare). Meanwhile, his proposed release plan would place pretrial services officers at risk in supervising him and, if and when the temporary release inevitably ends (whether because the COVID-19 risks subside or because he violates his bond), it will place the USMS officers at risk in re-apprehending him and the facility at risk when he eventually reenters it after having had abundant opportunity for contamination. On balance, Mr. Clark has not established a compelling reason that temporary release is necessary.

**IT IS THEREFORE ORDERED** that Defendant Henry Clark's Motion for Temporary Release from Custody (ECF No. 144) is denied.

**IT IS SO ORDERED.**

Dated March 25, 2020, at Topeka, Kansas.

   s/ Angel D. Mitchell

Angel D. Mitchell

U.S. Magistrate Judge

**All Citations**

Slip Copy, 2020 WL 1446895

---

Footnotes

1    Pursuant to Administrative Order 2020-3, all nonemergency criminal hearings are postponed pending further order of the court. Because of the time-sensitive nature of the relief requested and in accordance with Administrative Order 2020-3, the court rules without holding a hearing on the motion. *See, e.g., United States v. Martin*, --- F. Supp. ---, 2020 WL 1274857, at *3 (D. Md. 2020) (recognizing the Bail Reform Act is silent about whether the defendant is entitled to an in-court hearing after a detention order has issued and declining to grant one in an "endeavor to comply with the federal and State recommendations about avoiding bringing people together in groups larger than ten persons, as well as rule expeditiously").

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 1323036
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

UNITED STATES of America,
v.
Darin HAMILTON, Defendant.

19-CR-54-01 (NGG)
|
Signed 03/20/2020

**Attorneys and Law Firms**

Tanya Hajjar, U.S. Attorney's Office, Brooklyn, NY, for United States of America.

David Stern, Rothman, Schneider, Soloway & Stern, P.C., New York, NY, for Defendant.

**ORDER**

NICHOLAS G. GARAUFIS, United States District Judge.

**\*1** On January 31, 2019, Defendant Darin Hamilton was indicted on two counts of murder while engaged in narcotics trafficking in violation of 21 U.S.C. § 848(e)(1)(A) and one count of conspiracy to murder while engaged in narcotics trafficking in violation of 21 U.S.C. § 846. (Indictment (Dkt. 1).) On February 6, 2019, Magistrate Judge Robert M. Levy denied Mr. Hamilton's application for **bail**, concluding that no combination of conditions would ensure Mr. Hamilton's appearance and protect the safety of the community. (Order of Det. (Dkt. 9).) On March 16, 2020, Mr. Hamilton filed an emergency **bail** motion, arguing that, in light of Mr. Hamilton's advanced age and medical conditions (which include dementia and a history of stroke and heart attack), the ongoing **COVID-19** pandemic constituted a "compelling reason" to justify his release within the meaning of 18 U.S.C. § 3142(i). (Emergency Mot. for Bond ("Mot. 1") (Dkt. 42); see also Gov't Letter in Opp. ("Opp.") (Dkt. 43).) The following day, District Judge Margo K. Brodie denied that motion after a hearing, concluding that, in the absence of any cases of **COVID-19** in the Metropolitan Detention Center ("MDC") and any recent history of physical ailments, Mr. Hamilton was not "any more at risk than most of the inmates who are similarly situated." (Tr. of Mar. 17, 2020 **Bail** Hr'g. (Dkt. 44) at 9:12-13.) Judge Brodie further declined

to disturb the determination that Mr. Hamilton constituted a danger to the community and directed Mr. Hamilton to "make that application to [this court]." (Id. at 11:4-5; see also id. 11:11-21.)

Now before the court is Mr. Hamilton's renewed emergency motion for bond. (See Letter Mot. for Bond ("Mot. 2") (Dkt. 45); Supp. Letter Mot. for Bond ("Supp. Mot.") (Dkt. 47).) The Government opposes the application for the reasons set forth in its opposition to Mr. Hamilton's prior emergency application. (See Gov't Letter in Opp. (Dkt. 46).) Mr. Hamilton has waived his right to a hearing on this motion. (Supp. Mot.) For the following reasons, the motion is DENIED.

Because Mr. Hamilton has been charged with violations of the Controlled Substances Act for which the maximum penalty is life imprisonment or death, there is a rebuttable presumption that Mr. Hamilton poses both a danger to the community and a flight risk. 18 U.S.C. § 3142(e)(3). Where the presumption of detention attaches, the "defendant bears a limited burden of production—not a burden of persuasion—to rebut the presumption by coming forward with evidence that he does not pose a danger to the community or a risk of flight." *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001).

Notwithstanding this limited burden, Mr. Hamilton does not seriously endeavor to rebut the presumption that he poses a danger to the community beyond noting that the crimes alleged in the indictment were committed nearly 30 years ago and the fact that, since his release from state custody in 2003, Mr. Hamilton's interactions with the criminal justice system have been few and limited to relatively minor offenses (Supp. Mot. 2 at 2.) Notwithstanding, the court concludes that Mr. Hamilton has not met his burden to rebut the presumption of danger to the community that attaches based on the acts with which Mr. Hamilton has been charged, i.e. murdering two people in public places, in one incident himself, and in the other incident by hiring others. That presumption is further bolstered by Mr. Hamilton's lengthy criminal record, as set forth in the sealed pretrial services report.

**\*2** And, in any event, even if the court were to agree that Mr. Hamilton had successfully rebutted the presumption that he constitutes a danger to the community and that the Government had failed to meet its evidentiary burden to establish the same, Mr. Hamilton has not presented evidence to rebut the presumption that he poses risk of flight. That presumption is particularly strong in this case given his criminal history and the fact that he faces a maximum penalty

of life imprisonment or death. *See United States v. Jackson, 823 F.2d 4, 7 (2d Cir. 1987)* ("[P]ossibility of a severe sentence" and "extensive criminal history" both factors that weigh in favor of detention). The court also notes that Mr. Hamilton's prior conviction for witness intimidation further supports pretrial detention. *See 18 U.S.C. § 3142(f)(2)(B).*

Finally, Mr. Hamilton argues that, in light of his advanced age and medical conditions, the ongoing **COVID-19** pandemic constitutes "another compelling reason" to permit his temporary release under 18 U.S.C. 3142(i)(4). (Mot. 1 at 8-10; Supp. Mot.) This provision has been used sparingly to permit a defendant's release where, for example, he is suffering from a terminal illness or serious injuries. *See, e.g., United States v. Scarpa, 815 F. Supp. 88 (E.D.N.Y. 1993)* (permitting release of defendant suffering from terminal AIDS that could no longer be managed by correctional authorities); *see also United States v. Stephens, —— F. Supp. 3d ——, 2020 WL 1295155 (S.D.N.Y. Mar. 19, 2020)* (permitting release of defendant due to **COVID-19** pandemic). While the court is mindful of Mr. Hamilton's concerns, it does not believe that the **COVID-19** outbreak—at this point in time—constitutes

a sufficiently compelling reason to justify release under the circumstances of this case.

Mr. Hamilton does appear to fall within a higher-risk cohort should he contract **COVID-19**; however, he does not suffer from any pre-existing respiratory issues and his medical conditions appear to have been well managed over the course of the past fourteen months of incarceration. Further, and perhaps most importantly, as of this writing, there have been no reported incidents of **COVID-19** within MDC, and the Bureau of Prisons is taking system-wide precautions to mitigate the possibility of infection within its facilities. As such, given the risks that Mr. Hamilton's release would pose, the court concludes that the possibility of an outbreak at MDC is not a "compelling circumstance" justifying his release.

Accordingly, Mr. Hamilton's (Dkt. 45) Motion for Bond is DENIED.

SO ORDERED.

**All Citations**

Slip Copy, 2020 WL 1323036

---

**End of Document** <span style="float:right">© 2020 Thomson Reuters. No claim to original U.S. Government Works.</span>

2020 WL 1307109
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

In the MATTER OF the EXTRADITION
OF Alejandro TOLEDO MANRIQUE

Case No. 19-mj-71055-MAG-1 (TSH)
|
Signed 03/19/2020

**Attorneys and Law Firms**

Christopher J. Smith, Rebecca A. Haciski, U.S. Department of Justice Office of International Affairs, Washington, D.C., Elise LaPunzina, United States Attorney's Office, San Francisco, CA, for USA.

Graham E. Archer, Federal Public Defender, Oakland, CA, Joseph Pascal Russoniello, Browne George Ross LLP, San Francisco, CA, Mara Kapelovitz Goldman, Federal Public Defender, San Jose, CA, for Alejandro Toledo Manrique.

### ORDER RE: SECOND MOTION
### FOR RECONSIDERATION

Re: Dkt. No. 109

THOMAS S. HIXSON, United States Magistrate Judge

**\*1**  These are extraordinary times. The novel coronavirus that began in Wuhan, China, is now a pandemic. The nine counties in the San Francisco Bay Area have imposed shelter-in-place orders in an effort to slow the spread of the contagion. This Court has temporarily halted jury trials, even in criminal cases, and barred the public from courthouses.

Against this background, Alejandro Toledo has moved for release, arguing that at 74 years old he is at risk of serious illness or death if he remains in custody. The Court is persuaded. The risk that this vulnerable person will contract COVID-19 while in jail is a special circumstance that warrants bail. Release under the current circumstances also serves the United States' treaty obligation to Peru, which – if there is probable cause to believe Toledo committed the alleged crimes – is to deliver him to Peru alive.

The Court appreciates San Mateo County's management plan for the jail. It looks pretty detailed, although it seems to rely on self-reporting and observation to identify potentially infected people, and it doesn't say anything about testing. At oral argument, counsel for the government was unable to make any representations concerning Maguire's possession of testing kits. The Court is glad to hear that there are currently no reported cases of COVID-19 at Maguire, but is unsure what that means if people are not being tested. And, as the management plan itself acknowledges, symptoms of COVID-19 can begin to appear 2-14 days after exposure, so screening people based on observable symptoms is just a game of catch up. That's why the Bay Area is on lockdown. We don't know who's infected. Accordingly, the government's suggestion that Toledo should wait until there is a confirmed outbreak of COVID-19 in Maguire before seeking release, see ECF No. 113 at 6 ("If the situation with respect to COVID-19 at Maguire changes, Toledo is free to seek reconsideration of the issue at that point."), is impractical. By then it may be too late.

There is still the problem that Toledo is a flight risk. This problem has to a certain extent been mitigated by the existing pandemic. The Court's concern was that Toledo would flee the country, but international travel is hard now. Travel bans are in place, and even if Toledo got into another country, he would most likely be quarantined in God-knows-what conditions, which can't be all that tempting. Also, international travel would itself pose a risk of infection by likely putting Toledo in contact with people in close quarters. Maybe the risk of COVID-19 is worth it if he can make a run for it and get away. The government says he faces the prospect of life in prison if he is convicted in Peru. But escape is riskier and more difficult now.

While the risk that Toledo will flee cannot be completely mitigated, certain release conditions will help. Toledo must be on home lockdown and can leave only for medical appointments, attorney visits or court appearances (once attorney visits and court appearances resume). He must wear a GPS device so his movements can be tracked. There are a bunch of other release conditions as well. They are spelled out in the separate release form that will become the actual release order once it's been fully executed.

**\*2**  Let's talk about bail and sureties. Toledo's prior proposed bail package consisted of $1 million secured by cash and property (mostly property) put up by friends, with nothing from his wife. This was back when he was telling the Court

his wife had no money, and when his wife was saying the same thing to Pretrial Services. [1] He now offers essentially the same bail package. However, the Court has a concern about that – a concern that can be mitigated, but a concern nonetheless. Bail isn't just about money; it's about whose money it is. We want sureties who have moral suasion over the defendant. The idea is that if the defendant flees, he will cause people he cares about to lose money or property, so out of concern for them he won't do that. If Toledo's friends were putting up their assets at a time when his wife was sitting on $1 million in cash and near-cash equivalents, and she was offering nothing, this presents the concern that they were tricked, which causes the Court to wonder how much concern Toledo has for his friends and how much suasion they exercise over him. For any of his friends who are posting assets, the Court needs to confirm in a telephonic hearing that they know his wife had $1 million to her name last August and still today (according to her counsel) has between $700,000 and $800,000, and with that knowledge the friends are still willing to act as sureties. If they know the truth and are still willing to stand by him, the Court will accept that they wield suasion. (Also, independently of suasion, the Court does not want sureties to be misled.). Two of those sureties, Martin Carnoy and Larry Diamond, participated in the telephonic bail hearing and confirmed their knowledge and continued willingness to be sureties.

Also, Elaine Karp-Toledo must post some cash bail and surrender her passports. As noted, her counsel represents that she currently has between $700,000 and $800,000 and that she has ongoing legal expenses due to a criminal investigation into her and due to Peru's attempt to get her extradited as well. And, of course, she needs money for her and Toledo to live off of during the course of this proceeding. Toledo's counsel represents that Toledo's friends can put up a combined $325,000 in cash bail, plus security in two properties in Washington state. The Court will therefore set the bail amount at $1 million, to be secured by $500,000 in cash and the Washington properties. This allocates to Toledo's wife $175,000 in cash bail.

The Court acknowledges some uncertainty about whether this is enough money from Toledo's wife. The Court suspects Karp-Toledo has access to more money through family members. However, the Court prefers to base its bail decision on evidence, not just suspicions. The evidence the Court is starting with is the $1 million the government showed that Karp-Toledo possessed as of last August. That this would

have winnowed down to less than $800,000 today is not that surprising if she has ongoing legal expenses. She needs enough money to deal with her own legal problems and support her and her husband for what may be quite some time. With the surrender of her passports, and for all the same reasons that Toledo may not want or be able to flee right now, this amount of cash bail and all of the other release conditions seem sufficient to prevent the couple from fleeing, even if that cannot be completely guaranteed. If the government has or comes up with evidence that Karp-Toledo has more money than her counsel represented, the Court invites a motion for reconsideration of the bail amount.

So, when does Toledo get out? When the $500,000 in cash bail is posted and his wife surrenders her passports. That will require three more sureties to be admonished, and all six of the cash sureties to post the money. The Court will not, however, wait for the Washington properties to be posted as security. Under the best of circumstances, it takes a couple of weeks to post real estate, and the pandemic in Washington is even worse than here. It could be a while before that security gets posted, and there is urgency in getting Toledo released. So, the plan is that Toledo's lawyer should line up the remaining sureties, let the Courtroom Deputy know when they can be available, and the Court will admonish them by phone. Toledo's lawyer is in charge of getting everyone to sign the bond form. After the cash sureties have been admonished and signed, the $500,000 in cash has been posted, and Karp-Toledo surrenders her passports, the Court will issue the release order. At that point, Toledo must report to Pretrial Services in San Jose (that's also where his wife must surrender her passports) to be fitted with the GPS device. Toledo's second motion for reconsideration is accordingly **GRANTED**.

**\*3**  The government's request for "a brief stay" of any release order pending an appeal to Judge Chhabria is **DENIED** as unnecessary. As just explained, there are a few steps left before release happens. This order (i.e., the one you are reading) is the undersigned's decision that release on bail and other conditions is appropriate, and the government can appeal it right now.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2020 WL 1307109

Footnotes

1    Her lawyer, Ethan A. Balogh, has submitted a declaration in which he attempts to cast this as a misunderstanding. At the hearing he admitted he wasn't on the phone call between Ms. Karp-Toledo and the Pretrial Services officer, and the Court explained that this rendered his declaration worthless.

End of Document                            © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 1274857
Only the Westlaw citation is currently available.
United States District Court, D.
Maryland, Southern Division.

UNITED STATES of America
v.
Adam MARTIN, Defendant

Criminal Case No. PWG-19-140-13
|
Filed 03/17/2020

**Attorneys and Law Firms**

Matthew DellaBetta, Michael A. Goldsticker, US Attorney's Office, Baltimore, MD, for United States of America.

Gary Edward Proctor, Jennifer Elizabeth Smith, The Law Office of Gary E. Proctor, LLC, Baltimore, MD, for Defendant.

**MEMORANDUM OPINION AND ORDER**

Paul W. Grimm, United States District Judge

 *1  This Memorandum Opinion and Order addresses Defendant Adam Martin's appeal of a detention order issued by Chief Magistrate Judge Beth Gesner. Martin is charged with conspiracy to distribute controlled substances (heroin, cocaine) in violation of 21 U.S.C. § 846. If convicted, he faces a sentence of not less than ten years incarceration, up to a maximum term of life imprisonment. In a written ruling entered following a detention hearing held on June 25, 2019, Chief Judge Gesner observed that there was a presumption under 18 U.S.C. § 3142(e)(3)(A) (the "Bail Reform Act") that Martin should be detained, which he had not rebutted. ECF No. 71. She further found by clear and convincing evidence that due to: the nature of the case against Martin, his role in the offense, the weight of the evidence against him (including substantial intercepted wire conversations discussing the use of guns and violence and the seizure of firearms from Martin), coupled with his prior poor adjustment to community supervision, violations of probation, and commission of the charged misconduct while on court supervision, that he should be detained. *Id.* Martin appealed, citing the circumstances regarding the COVID-19 pandemic as reason for his release. ("Appeal"), ECF No. 206.

The Government has filed an opposition, ECF No. 207, and Martin a reply, ECF No. 208. For the reasons discussed below, Martin's appeal is DENIED.

**Background**

The essence of Martin's appeal is that the recent state of emergency declared by the Federal and Maryland State governments relating to the COVID-19 pandemic constitutes information not known by him at the time of his detention hearing that is material to whether there are conditions of release that may be fashioned to assure his appearance at trial and protect the community under 18 U.S.C. § 3142(f)(2)(B). Appeal at 5. Specifically, Martin contends that he suffers from diabetes, high blood pressure, asthma, and pain, and worries that his continued detention in the Chesapeake Detention Facility ("CDF") likely will cause him to fall victim to the COVID-19 virus, and that the medical and correctional authorities at CDF will be overwhelmed with inmates who have contracted the virus, and unable to provide him with adequate care. Appeal at 2–4; *see also* Communication of Health Needs, June 24, 2019, ECF No. 32. He seeks release to the third-party custody of his wife with "24/7 electronic monitoring." Appeal at 4. He argues that his lifelong residence in Baltimore means that he is not a flight risk, and that, his extensive criminal history notwithstanding, none of his prior offenses are for crimes of violence (but acknowledges that he has two prior firearms convictions). *Id.* at 3–4. Therefore, he concludes, he is not a danger to the community. *Id.* He asks for and expedited hearing at which he wants the warden and director of health services at CDF to testify. *Id.* at 5.

The Government sees things quite differently. It points out that Martin has not challenged, let alone rebutted, any of Chief Judge Gesner's factual findings, nor has he overcome the presumption of detention. Opposition at 1. It argues that Martin is a lead defendant in a 17-defendant drug conspiracy, and that a search warrant of two stash houses that Martin maintained yielded five firearms, over 200 grams of cocaine base, and other narcotics. *Id.* at 2. And, it detailed the weight of the evidence that Chief Judge Gesner cited as one of the reasons for his detention, which included: wiretap interceptions where Martin reveals the extent of his leadership role in the drug conspiracy, intention to "beat the fuck out of" a drug associate who he thought had stolen drugs from another co-conspirator, as well as intercepted conversations where Martin and his confederates discussed procuring firearms to aid in the conspiracy. *Id.* at 4–5.

**\*2** The Government also highlighted Martin's extensive criminal record (he has managed to accumulate 17 criminal history points, easily securing him a criminal history of VI under the sentencing guidelines, the highest possible category), and his poor adjustment to community and court supervision. *Id.* at 6–7. And, the Government urges the Court to consider the nature and seriousness of the danger that it perceives that Martin poses to the community in the event of his release. *Id.* at 7–8. The Government also argues that state correction officials at CDF have established comprehensive health measures to avoid a COVID-19 outbreak, that there are (for now, at least) no known cases of any detainees at CDF having contracted the virus, and that, in essence, Martin seeks release on the mere speculation that he will become ill. *Id.* at 8–12. In this regard, the Government lauds what it views as the "substantial experience" of correctional officials in Maryland with dealing with transmission of viruses within a detention facility, including successfully dealing with serious diseases such as "HIV/AIDS, MRSA, sexually transmitted diseases, viral hepatitis, tuberculosis, and seasonal influenza." *Id.* at 9. Finally, citing *United States v. Williams*, 753 F. 2d 329, 331 & n.7 (4th Cir. 1985), the Government argues that this court may resolve Martin's appeal on the written submissions, accepting the proffers of counsel for the facts upon which they rely. *Id.* at 3, n.2.

In his reply, Martin repeats his earlier arguments, expresses his belief that it will be just a matter of time before he contracts COVID-19 if he remains detained, and that the Government's faith in the ability of CDF to prevent, let alone contain and treat an outbreak of the virus, does not warrant taking the risk that he would face if his detention continues. Reply at 1-3.

## Discussion

Before addressing the arguments of the parties and the evidence before me, it is important to recognize the unprecedented magnitude of the COVID-19 pandemic. While correctional officials at CDF and other facilities in Maryland may successfully have dealt with past viruses and outbreaks of communicable diseases, they pale in scope with the magnitude and speed of transmission of COVID-19. This virus comes in the form of a world-wide pandemic, resulting in a declaration of a national emergency by the federal government, and state of emergency by the State of Maryland. With no known effective treatment, and vaccines months (or more) away, public health officials have been left to

urge the public to practice "social distancing," frequent (and thorough) hand washing, and avoidance of close contact with others (in increasingly more restrictive terms)—all of which are extremely difficult to implement in a detention facility. For this reason, the Court takes this health risk extremely seriously, and recognizes that it can indeed constitute new information having a material bearing on whether there are conditions of release that will reasonably assure the appearance of detained defendants and secure the safety of the community. 18 U.S.C. § 3142(f)(2)(B). Indeed, the Due Process Clauses of the Fifth or Fourteenth Amendments, for federal and state pretrial detainees, respectively, may well be implicated if defendants awaiting trial can demonstrate that they are being subjected to conditions of confinement that would subject them to exposure to serious (potentially fatal, if the detainee is elderly and with underlying medical complications) illness. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, we think that the proper inquiry is whether those conditions amount to punishment of the detainee. For under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."); *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983) ("The Due Process Clause, however, does require the responsible government or governmental agency to provide medical care to [pretrial detainees] who have been injured...."); *Loe v. Armistead*, 582 F.2d 1291, 1293–94 (4th Cir. 1978) ("[Defendant] was not a prisoner detained under a judgment of conviction; rather, he was a pretrial detainee. Under such circumstances, the protections that apply to him are found in the due process clause of the fifth amendment, since he was a federal prisoner, rather than in the eighth amendment's prohibition against cruel and unusual punishment."); *Brown v. Harris*, 240 F.3d 383, 388 (4th Cir. 2001) (For state pretrial detainee, "the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment, mandates the provision of medical care to *detainees* who require it.") (emphasis in original).

**\*3** But as concerning as the COVID-19 pandemic is, resolving an appeal of an order of detention must in the first instance be an individualized assessment of the factors identified by the Bail Reform Act, 18 U.S.C. § 3142(g): the nature and circumstances of the offense charged, including whether it involves controlled substances or firearms; the weight of the evidence against the defendant; the defendant's history and characteristics (including history relating to drug

abuse, defendant's criminal history, and record of appearing at court proceedings); whether the detainee was on probation, parole, or other court supervision at the time of the alleged offense conduct; and the nature and seriousness of the danger to any person or the community posed by the defendant's release. When addressing an appeal of a detention order, the Court must reach a determination promptly. 18 U.S.C. § 3145(c).

While the Bail Reform Act is silent about whether the defendant is entitled to an in-court hearing on an appeal of a detention order, there is ample authority for the conclusion that the Court may decide the motion on the filings (including proffers offered by counsel) as opposed to a hearing. 18 U.S.C. § 3145(b) establishes that "[i]f a person is ordered detained by a magistrate judge" that person "may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order." Upon such a motion, the court must make a *de novo* "determination as to whether the magistrate judge's findings are correct based on the court's review of the evidence before the magistrate judge." *United States v. Sidbury*, No. LWF-15-184, 2015 WL 8481874, at *1 (E.D.N.C. Dec. 8, 2015) (citing *United States v. Williams*, 753 F.2d 329, 333–34 (4th Cir. 1985)). The court "may conduct an evidentiary hearing" as part of its review. *United States v. King*, 849 F.2d 485, 490 (11th Cir. 1988). However, "there is no statutory requirement that the court hold a hearing" and the court "retains the discretion to decide whether to hold a hearing." *United States v. Oaks*, 793 F. App'x 744, 747 (10th Cir. 2019). *See also, Williams*, 753 F.2d at 331 (recognizing that the court may permit the parties to "introduce proffers of evidence" as an alternative way to allow the introduction of new evidence); *United States v. Hensler*, 18 F.3d 936 (5th Cir. 1994) (holding defendant was not entitled to evidentiary hearing); *King*, 849 F.2d at 490 ("based solely on a careful review of the pleadings and the evidence developed at the magistrate's detention hearing, the district court may determine that the magistrate's factual findings are supported and that the magistrate's legal conclusions are correct.").

A *de novo* review of the written submissions and docket filings is especially appropriate in this case, when the Court must endeavor to comply with the federal and State recommendations about avoiding bringing people together in groups larger than ten persons, as well as rule expeditiously.

On the record before me, I conclude that Chief Magistrate Judge Gesner's initial assessment of Martin was correct.

Given the nature of the charges against him, there is a presumption that he should be detained. As set forth in the Government's proffer (and confirmed by Chief Judge Gesner's detention order), Martin is charged with being a lead-defendant in a multi-defendant drug conspiracy operating in Baltimore City. If convicted, he must be sentenced to a mandatory minimum term of ten years incarceration, up to a maximum term of life imprisonment. Search warrants executed on safe houses controlled by him produced substantial amounts of controlled substances and multiple firearms. Wiretap intercepts confirmed the degree of his involvement in the conspiracy, as well as his inclination to resort to violence to deal with persons thought to have stolen drugs from a co-conspirator. He was intercepted discussing the use of guns and violence to further the conspiracy.

**\*4** Further, his criminal history is extensive, and includes two prior firearms offenses, as well as controlled substance offenses. When placed on community or court supervision, he has violated his release conditions, and was on court supervision at the time of the conduct currently charged in this case. The best predictor of how Martin will behave if he were to be released is how he has behaved when released in the past, and his track record is a poor one.

Nor has Martin established that, if released, he would not continue to be a danger to the community. While the location monitoring that he proposes may offer useful information about where he is, it provides little useful information about what he is doing, and the ready accessibility of smart phones and digital communication devices would make it all too easy for him to resume his involvement (directly or through confederates) in the distribution of controlled substances without detection. Moreover, location monitoring is not a limitless resource, nor is its installation and monitoring by United States Pretrial Services officers without risk to those personnel (who must be trained and certified to install location monitoring) given the current recommendations regarding implementation of social distancing.

Finally, while the record confirms that Martin has disclosed that he suffers from asthma, high blood pressure, and diabetes, this alone is insufficient to rebut the proffer by the Government that the correctional and medical staff at CDC are implementing precautionary and monitoring practices sufficient to protect detainees from exposure to the COVID-19 virus.

For all the above reasons, I reach the same conclusion as Chief Magistrate Judge Gesner. Martin has failed to rebut the presumption of detention, and the Government has established by clear and convincing evidence that he must continue to be detained for the protection of the community. Therefore, his appeal is DENIED.

## **ORDER**

Accordingly, it is, this 17th day of March, 2020, hereby ORDERED that Defendant's Appeal of Detention Order and Request for Hearing and, Following That, Release, ECF No. 206, IS DENIED.

**All Citations**

Slip Copy, 2020 WL 1274857

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA | **AMENDED ORDER** |
| v. | **19 Cr. 297 (PAE)** |
| JOSE PEREZ, | |
| Defendant. | |

Upon the application of defendant Jose Perez, pursuant to 18 U.S.C. § 3142(i) for temporary release from custody during the current COVID-19 pandemic (Dkt. 58), and the Government's opposition thereto (Dkt. 59), IT IS HEREBY ORDERED:

1. The Court's decision in this case is based on the unique confluence of serious health issues and other risk factors facing this defendant, including but not limited to the defendant's serious progressive lung disease and other significant health issues, which place him at a substantially heightened risk of dangerous complications should be contract COVID-19 as compared to most other individuals. Accordingly, this Order should not be construed as a determination by this Court that pretrial detention is unsafe or otherwise inappropriate as a general matter or in any other specific case.

2. Pursuant to 18 U.S.C. § 3142(i), the Court concludes that compelling reasons exist for temporary release of the defendant from custody during the current public health crisis. Accordingly, the defendant's application is GRANTED pursuant to the following conditions:

3.  The Clerk of Court is directed to prepare a new personal recognizance bond with the following conditions of release:

    a.  A personal recognizance bond in the amount of $75,000, to be signed by the defendant and co-signed by the defendant's wife and adult son as sureties;

    b.  All mandatory conditions of release included in this Court's standard "Order Setting Conditions of Release" form;

    c.  Third-party custodianship by the defendant's wife, Ms. Annette Piri-Perez, who shall be responsible to this Court for ensuring the defendant's compliance with these conditions of release;

    d.  Home incarceration at the defendant's wife's residence in the Bronx, New York, with monitoring by means chosen at the discretion of Pretrial Services. The defendant shall be on 24-hour lockdown in the residence except for emergency medical visits. Any another leave from the residence must be approved by either the Pretrial Services officer or by the Court on application from defense counsel.

    e.  No visitors to the residence except for family members;

    f.  Pretrial Services supervision as directed by the Pretrial Services Office;

    g.  Surrender all passports and other travel documents and make no applications for new or replacement documents;

    h.  Drug testing as directed by the Pretrial Services Office;

    i.  The defendant shall not possess a firearm, destructive device, or other weapon;

j.  The defendant shall not use or possess any narcotic drug or controlled substance unless prescribed by a licensed medical practitioner;

k.  The defendant shall have no intentional or prolonged contact directly or indirectly with any child under the age of 18 (including, without limitation, his grandchildren) without prior permission of the Pretrial Services Office and then only in the presence of another adult chaperone family member as approved by the Pretrial Services Office;

l.  The defendant shall not view, purchase, or distribute any materials depicting minors in the nude or engaged in sexually explicit conduct or positions;

m.  The defendant shall have no access to the internet or any internet-enabled electronic device.  He shall use only a "flip" phone.  The Pretrial Services Office shall work with the defendant's wife to password protect all internet-enabled devices in the home, and the defendant's wife shall not provide the password to the defendant.

n.  The defendant shall be released upon the signature of the defendant and the two sureties on the bond, including Ms. Piri-Perez's agreement to act as third-party custodian under the above conditions; and, if Mr. Perez has not yet been released pursuant to the Court's initial order, upon the Pretrial Services Office's installation of the monitoring technology that it selects.  The Pretrial Services Office shall conduct a home visit as soon thereafter as is practicable to establish all remaining safeguards, with any remaining conditions to be satisfied within one week of the date of this Order.

4.  The Pretrial Services Office is directed to immediately alert the Court, the
Government, and defense counsel of any violation of the above conditions, without need for a
formal violation petition.  The defendant is hereby notified that violation of the conditions of
release will likely result in revocation of this temporary release.

5.  Defense counsel is directed to submit a status update letter to the Court once a week
after consultation with the Government, informing the Court as to the defendant's status, health,
and compliance with the conditions of release.

6.  This Order is subject to modification or revocation by the Court at any time.  The
Court intends to terminate the defendant's temporary release and return the defendant to pretrial
detention as soon as the Court concludes that the defendant no longer faces the acute health risk
posed by the current circumstances.

SO ORDERED.

Dated: New York, New York
       March 19, 2020

_____
THE HONORABLE PAUL A. ENGELMAYER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF NEW YORK

2020 WL 1468005
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

UNITED STATES OF AMERICA,
v.
HERMAN STEWARD, Defendant.

S1: 20cr0052 (DLC)
|
Filed 03/26/2020

MEMORANDUM OPINION AND ORDER

DENISE COTE United States District Judge

On March 19, 2020, the defendant sought temporary release from the Metropolitan Correctional Center ("MCC") pursuant to 18 U.S.C. § 3142(i) on account of the COVID-19 pandemic. The Government opposes the defendant's release. The defendant's application is denied.

The defendant has been indicted for violation of 21 U.S.C. § 846. In particular, he has been indicted for conspiring to distribute and possess with intent to distribute 28 grams and more of mixtures and substances containing a detectable amount of cocaine base, in violation of 21 U.S.C. § 841(b)(1)(B). He is facing a mandatory minimum term of imprisonment of five years and the Government calculates his sentencing guidelines range as 262 to 327 months. Trial is scheduled for November 2, 2020.

The defendant consented to remand following his release, without prejudice to a future application for bail. The Government has shown by clear and convincing evidence that his release into the community would present a danger to others, and the defendant does not argue otherwise.

Among other things, the defendant has a lengthy criminal record, including for violation of conditions of release and supervision on release. In this case, there is recorded evidence of his participation in a drug conspiracy in which he sold crack cocaine to others. The Government represents that it will be able to prove at trial that some of those sales were from the defendant's own apartment.

The defendant makes this application pursuant to Section 3142(i). That section provides that a

> judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason.

18 U.S.C. § 3142(i).

The defendant has not identified any appropriate person into whose custody the defendant may be released or shown a compelling reason for this release. Indeed, based on the record currently before the Court, it appears that the defendant's release into the community would endanger the safety of the community. There is also no reason to find that the defendant's release would lessen the risk to his health presented by COVID-19.

All Citations

Slip Copy, 2020 WL 1468005

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 2:19-cr-00877-CCC   Document 74-1   Filed 03/27/20   Page 37 of 39 PageID: 1714
UNITED STATES OF AMERICA v. JULIUS VALENTINE..., Slip Copy (2020)

2020 WL 1434130

2020 WL 1434130
Only the Westlaw citation is currently available.
United States District Court, D. Maryland.

UNITED STATES OF AMERICA
v.
JULIUS VALENTINE WILLIAMS, Defendant

CRIMINAL NO. PWG-13-544
|
03/24/2020

Charles B. Day, United States Magistrate Judge

**MEMORANDUM OPINION**

**\*1**  The Court has received Defendant's Emergency Motion for Reconsideration of Bond (the "Emergency Motion"), ECF No. 92. The Court has reviewed the Emergency Motion and the Opposition thereto, ECF No. 93. No hearing is deemed necessary. Local Rules 105.6 and 207 (D. Md.) The Court hereby DENIES the Emergency Motion.

**I. Relevant Procedural History**
As set forth in the submissions of the parties, the release history of Defendant is well documented. On October 7, 2013, Mr. Williams appeared before the Court on charges of filing false tax returns. He was released on conditions. ECF No. 8. Seven months later, the Court felt compelled to order Defendant's detention in light of evidence that Mr. Williams was continuing to engage in the same unlawful misconduct. After subsequently being found guilty of tax fraud and identity theft, and serving years of incarceration, Mr. Williams was again offered the opportunity to be free in the community under explicit terms of supervised release. Nonetheless, within seven months of his release, his supervising officials were seeking his detention. This time, it was alleged that Mr. Williams was not reporting as required, not paying restitution as ordered, refusing to provide required documents as directed, and was again preparing and submitting false tax documents. At the initial appearance held on May 2, 2019, the Court released Mr. Williams on conditions.

By November 2019, another petition was filed, alleging that Mr. Williams had been arrested and charged by the State of Georgia with filing fraudulent tax statements. The parties and the Court agreed to delay addressing these concerns, yet before a hearing could held, another petition was filed noting that Mr. Williams had been out of contact for months with both his federal and State of Georgia supervising officers. On February 7, 2020, this Court issued a warrant for Mr. Williams' arrest.

A hearing was held on February 11, 2020, wherein the Court was persuaded that Mr. Williams' history of misconduct on release was repeating itself. Mr. Williams' post-conviction conduct was mirroring his pre-conviction conduct years earlier. The Government proffered evidence to believe that Mr. Williams was resuming his involvement in criminal activity and was refusing to allow meaningful supervision while in the community. Moreover, as a person under supervision, Mr. Williams was not able to demonstrate by "clear and convincing evidence" that he would appear for court as told, follow the lawful instructions of the Court or of his supervising officer, or to otherwise obey the law. Order of Detention, February 11, 2020, ECF No. 85; Fed. R. Crim. P. 32.1(a)(6). It is within this context, that Defendant's Emergency Motion is written.

**II. The COVID-19 Pandemic**
It is understandable for any person presently incarcerated during the pendency of the global COVID-19 pandemic to want an immediate release. Ordinarily, the Court does not "recalculate" a decision to release or to detain a defendant in the absence of new information that was not available at the time of the original determination. Under the Bail Reform Act the Court is required to consider a host of factors which might inform the question of detention, including changed circumstances.

> **\*2**  The hearing may be reopened, before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community.

18 U.S.C. Section 3142(f). While the deadly virus may have been in development, the national and international impact of COVID-19 was not on the radar of the parties or the Court at the time of the detention hearing held on February 11. The impact of this virus has been universal, affecting nearly all aspects of life in the District of Maryland. Its existence is unquestionably "material."

The present knowledge of COVID-19 is amply documented by the voluminous references set forth in the Emergency Motion. Virtually every sector of public life has been affected, with both private and governmental operations being scaled back to a minimum or shuttered altogether. Experts tell us that the rate of infections has yet to peak in the United States, so conditions are expected to worsen. The Court accepts that as a 67-year-old person, Mr. Williams is a member of a group considered more vulnerable to contracting this deadly virus than others.

The Court is mindful that it bears a fiduciary responsibility to that those that are detained in jails and prisons. The incarcerated look to the Courts for protection of their health, welfare and personal rights in general. However, the Courts are not on the front line. That space is rightly occupied by corrections officials and their administration. On this record, there is no suggestion of mistreatment, dereliction of duty, mismanagement, or other concern. To the contrary, the Government's Opposition speaks with specificity about the absence of an effect of the virus on Mr. Williams, whereas the Emergency Motion merely raises general concerns that are true for every older person who is incarcerated.

Defendant rightfully reminds the Court that those in detention facilities "have poorer health than the general population, and even at the best of times, medical care is limited in these facilities. Many people who are incarcerated also have chronic conditions, like diabetes or HIV, which makes them vulnerable to severe forms of COVID 19." Emergency Motion 4-5. The defense goes on to note that these people are "at special risk given their living situation." Id. at 5. These are challenges that cannot be denied, but as they relate to the issue of release, they are concerns not concrete enough to justify the release of Mr. Williams.

It is the Government that provides the specific details here. While the situation may change, as of March 20, 2020 "there are no cases of COVID-19" at Mr. Williams' detention facility. Gov't Opp'n 6. The Government correctly notes that the defense makes no suggestion that Mr. Williams

has the virus, or that he has been exposed to the virus. Id. Mr. Williams is merely casting possibilities in light of his understandable apprehension. Aside from being an older person, Mr. Williams has expressed no other physical vulnerabilities. As the Government writes, detained persons with more compromised physical health have made similar arguments to no avail. See United States v. Martin, PWG 19-140, March 17, 2020 (D. Md.)(J. Grimm), ECF No. 209; United States v. Bilbrough, TDC 20-33, March 20, 2020 (D. Md.)(J. Sullivan), ECF No. 76. The Court has also considered the reasoning in United States v. Jones, CCB 17-582, March 20, 2020, (D. Md.)(J. Coulson), ECF No. 136, wherein the defendant was pregnant, on prescribed medications, and seeking release due to COVID-19. The Court has reflected on all of the considerations and factors in play at the detention hearing held on February 11. Even with the pandemic that has befallen us, it does not change the calculus of detention here.

**\*3** The Government has articulated in great detail the measures implemented by the facility where Defendant is housed. Gov't Opp'n 7-8. These measures are extensive and, up to the present moment, adequate as it appears the facility has a lower incidence of infection than the general population. Should the unfortunate event occur, the correctional authorities have in place a plan of action that should not be summarily embraced or discarded. Nor does it follow that a presumption of release materializes without more details about the impact upon Mr. Williams directly. Information regarding prisoner movements, his proximity to those infected, and other measures taken in response (or not) will be important factors to consider. As has been mentioned by this Court on several occasions, the Bail Reform Act requires an "individualized determination" about the appropriateness of release for each defendant.

In summary, Defendant has still failed to demonstrate by clear and convincing evidence that release is appropriate. The existence of the present pandemic, without more, is not tantamount to a "get out of jail free" card. Not even for the older person being detained. While there has been a change in conditions as a result of the pandemic, there has not been enough change to justify the release of Mr. Williams.

### III. Conclusion

The Court is not persuaded that Defendant has demonstrated by clear and convincing evidence that he should be released from detention. The combination of his age and the existence of COVID-19, standing alone, are not sufficient for the

2020 WL 1434130

reasons stated above. Accordingly, Defendant's Emergency Motion is DENIED.

So Ordered this 23 rd day of March, 2020.

/s/

Charles B. Day

United States Magistrate Judge

**All Citations**

Slip Copy, 2020 WL 1434130

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.